Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
V Chai Oliver Prentice (State Bar No. 309807)
*vprentice@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

Hassan A. Zavareei (State Bar No. 181547)
*hzavareei@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900

George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (212) 643-0500

Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
Carlos Ramirez (appearing *pro hac vice*)
*cramirez@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

*Attorneys for Plaintiff Ronald Chinitz and the
Proposed Plaintiff Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| RONALD CHINITZ, individually, and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>     vs.<br><br>INTERO REAL ESTATE SERVICES,<br><br>                Defendant. | Case No. 5:18-cv-05623-BLF<br><br>**PLAINTIFF RONALD CHINITZ'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: April 23, 2020<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br>Judge: Honorable Beth Labson Freeman |

**PLEASE TAKE NOTICE** that on April 23, 2020, at 9:00 a.m., Plaintiff Ronald Chinitz ("Plaintiff"), individually and on behalf of all others similarly situated, will and hereby does move for class certification before the Honorable Beth Labson Freeman, Courtroom 3, Fifth Floor, United States District Court for the Northern District of California, San Jose Courthouse, 280 South First Street, San Jose, California 95113.

Plaintiff respectfully seeks class certification pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff makes this motion on the ground that the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are met. Plaintiff also makes this motion on the ground that questions of law and fact common to the Class predominate over any questions affecting individual members, and a class action is the superior method for adjudicating the dispute. Furthermore, Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

Plaintiff bases the motion on the following documents: this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the pleadings, record, and other filings in the case; the Declaration of Sabita J. Soneji and its accompanying exhibits, the Declaration of Anya Verkhovskaya, and the Declaration of Ronald Chinitz, all filed concurrently herewith; and such other oral and written points, authorities, and evidence as the parties may present at the time of the hearing on the motion.

**TYCKO & ZAVAREEI LLP**

Dated: January 17, 2020

*/s/ Sabita J. Soneji*
Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Attorneys for Plaintiff Ronald Chinitz and the Proposed Plaintiff Class*

**<u>TABLE OF CONTENTS</u>**

I.    Introduction ................................................................................................................... 1

II.   Statement of Issues to Be Decided .............................................................................. 2

III.  Factual Background....................................................................................................... 2

      A.    Intero Trains Its Sales Associates to Cold-Call to Generate Real Estate Business........ 2

      B.    Intero Trains Its Sales Associates on Who to Call, What to Say, and How to
            Generate More Leads by Using Third Party Services. ....................................... 4

      C.    Intero Fails to Comply with the TCPA Yet Reaps Profits from Illegal Calls................. 5

      D.    Intero Fostered a Culture of Non-Compliance.................................................... 7

      E.    Intero Sales Associates Placed Millions of Illegal Telemarketing Calls on Intero's
            Behalf to Hundreds of Thousands of Consumers, Including Plaintiff........................... 9

IV.   Statutory Background of the Class Members' Claims.................................................. 11

V.    The Court Should Certify the Proposed Classes ......................................................... 12

      A.    Common Questions Predominate........................................................................ 13

            1.    Common evidence will show that Intero sales associates made calls that
                  violate the TCPA.................................................................................... 15

            2.    Common evidence will show those calls were made on Intero's behalf. ........ 17

            3.    Common evidence will show that Intero knew about or was willfully
                  ignorant of its sales associates' TCPA violations.................................... 17

            4.    Intero will mount common defenses to the claims of all Class members. ...... 18

            5.    Class wide relief can be proven on a common basis. ........................... 20

      B.    All Other Requirements of FRCP 23(a), 23(b)(2), and 23(b)(3) Are Met. .................... 21

            1.    The Proposed Classes Are Sufficiently Numerous. ............................. 21

            1.    Plaintiff's Claims Are Typical of the Class Members' Claims .......................... 22

            2.    Mr. Chinitz and his counsel Adequately Represent the Class Members......... 22

            3.    The Requirements of Rule 23(b)(2) Are Met. ..................................... 23

            4.    A Class Action Is the Superior Method of Resolving Mr. Chinitz's and
                  the Class Members' TCPA Claims. ....................................................... 24

VI.   Conclusion.................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
No. 15-CV-6314-YGR, 2017 WL 1806583 (N.D. Cal. May 5, 2017)....................... 15, 20

*Agne v. Papa John's Intn'l, Inc.*,
286 F.R.D. 559 (W.D. WA 2012) ........................................................................ 24

*Ahmed v. HSBC Bank USA, Nat'l Ass'n*,
No. 15-cv-02057-FMO-SP, 2017 WL 5720548 (C.D. Cal. Nov. 6, 2017) ................... 12

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997).......................................................................................... 24

*Bee, Denning, Inc. v. Capital All. Grp.*,
310 F.R.D. 614 (S.D. Cal. 2015).......................................................................2, 24

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017)............................................................................ 13

*California Real Estate Loans, Inc. v. Wallace*,
23 Cal. Rptr. 2d 462 (Ct. App. 1993) ................................................................... 18

*Combe v. Intermark Commc'ns, Inc.*,
No. CV0909127SJOPJWX, 2010 WL 11597517 (C.D. Cal. Nov. 18, 2010) ............... 24

*Comcast v. Behrend*,
569 U.S. 27 (2013) ........................................................................................... 20

*Duguid v. Facebook, Inc.*,
No. 17-15320, 2019 WL 2454853 (9th Cir. June 13, 2019).................................... 11

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........................................................................ 12, 21

*Esparza v. SmartPay Leasing, Inc.*,
No. 17-cv-03421-WHA, 2019 WL 2372447 (N.D. Cal. June 5, 2019)....................... 14

*Etzelsberger v. Fisker Auto., Inc.*,
300 F.R.D. 378 (C.D. Cal. 2013) ........................................................................ 25

*Gipson v. Davis Realty Co.*,
30 Cal. Rptr. 253 (Ct. App. 1963) ....................................................................... 18

*Henderson v. United Student Aid Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019) ...................................................................... 12, 20

*Hernandez v. Cty. of Monterey*,
305 F.R.D. 132 (N.D. Cal. 2015) ........................................................................ 21

*In re Joint Pet. Filed by Dish Network*,
28 FCC Rcd. 6574 (2013) .................................................................................. 12

*In re King St. Investments, Inc.*,
219 B.R. 848 (B.A.P. 9th Cir. 1998) .................................................................... 18

*In re Online DVD Rental Antitrust Litig.*,
No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ................... 22, 23

*J.L. v. Cissna*,
No. 18-cv-04914-NC, 2019 WL 415579 (N.D. Cal. Feb. 1, 2019) .......................... 12

*Jones v. Royal Admin. Servs., Inc.*,
887 F.3d 443 (9th Cir. 2018).............................................................................. 19

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ...................................................................... 2, 15, 17

*Kristensen v. Credit Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) ...................................................................... 15

*Meyer v. Bebe Stores, Inc.*,
    No. 14-CV-00267-YGR, 2017 WL 558017 (N.D. Cal. Feb. 10, 2017) ........................................ 25

*Nevarez v. Forty Niners Football Co.*,
    326 F.R.D. 562 (N.D. Cal. 2018) ...................................................................... 22

*Pulaski v. Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ...................................................................... 20

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ...................................................................... 23

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) ...................................................................... 22

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ...................................................................... 14

*True Health Chiropractic Inc. v. McKesson Corp.*,
    332 F.R.D. 589, 606 (N.D. Cal. 2019) ...................................................................... 22

*Tyson Foods v. Bouaphakeo*,
    136 S.Ct. 1036 (2016) ...................................................................... 14

*Wagner v. CLC Resorts & Developments, Inc.*,
    32 F. Supp. 3d 1193 (M.D. Fla. 2014) ...................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................... 13

*West v. California Servs. Bureau, Inc.*,
    323 F.R.D. 295 (N.D. Cal. 2017) ...................................................................... 21

*Whitaker v. Bennett Law, PLLC*,
    No. 13-cv-03145-L-NLS, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) ........................................ 15

*Wolin v. Jaguar Land Rover North America, LLC*,
    617 F.3d 1168 (9th Cir. 2010) ...................................................................... 14, 24, 25

*Wolph v. Acer Am. Corp.*,
    272 F.R.D. 477 (N.D. Cal. 2011) ...................................................................... 23

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................... 14

**STATUTES**

47 U.S.C. § 227(c)(5) ...................................................................... 12, 15

47 U.S.C. § 227(c)(5)(B) ...................................................................... 11

47 U.S.C. § 227(b)(1)(B) ...................................................................... 16

**RULES AND REGULATIONS**

47 C.F.R. § 64.1200(c)(1) ...................................................................... 16

47 C.F.R. § 64.1200(c)(2) ............................................................................................ 11, 15

47 C.F.R. § 64.1200(d) .......................................................................................... 11, 15, 16

Cal. Bus. & Prof. Code § 10010.5(b)(2) ........................................................................ 18

Cal. Bus. & Prof. Code § 10032(a) ................................................................................ 18

Cal. Code Regs. tit. 10, § 2725 ....................................................................................... 19

FED. R. CIV. P. 23(a)(3) .................................................................................................. 21

FED. R. CIV. P. 23(a)(4) .................................................................................................. 22

FED. R. CIV. P. 23(b)(2) .................................................................................................. 23

FED. R. CIV. P. 23(b)(3)(A)–(D) ................................................................................... 24

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 2.03, cmt. a ............................................................... 19

Restatement (Third) of Agency § 3.03, cmt. b ............................................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

Defendant Intero Real Estate Services ("Defendant" or "Intero") operates through over a thousand real estate agents, primarily in California, who represent consumers when they buy and sell real estate. To bring in new business, many of Intero's real estate agents "cold call" residential and cellular telephone numbers, ignoring whether the calls are unwanted. In their zeal to find more clients, outpace the competition, and make more money for themselves and Intero, these agents cold-call individuals who have registered their numbers on the National Do Not Call Registry ("NDNCR"); turn a blind eye to TCPA rules concerning maintenance and use of a company do not call list; place calls using artificial or prerecorded messages without consent; and call potential clients before 8 a.m. or after 9 p.m. By engaging in and promoting these practices, Intero systematically violated, and continues to violate, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

After his home's for-sale listing expired in November 2017, named Plaintiff Ronald Chinitz ("Plaintiff") received over 10 unsolicited telemarketing calls by or on behalf of more than half a dozen Intero agents, some employed prerecorded messages, and some came early in the morning or late at night. Moreover, the record before the Court shows that he is not alone: Plaintiff's expert's analysis reveals that, during the Class period, Intero made *hundreds of thousands* of similar telemarketing calls that violate the TCPA.

Plaintiff seeks to have this case certified as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3) to vindicate the rights under the TCPA of thousands of class members to be free from invasive—and maddening—telemarketing practices and to resolve their claims in one fair and efficient proceeding. Certification is appropriate because common questions dominate resolution of this case. All claims arise out of a simple common course of conduct: Defendant's pervasive practice of placing unwanted calls, which Plaintiff will prove on behalf of all class members using centralized evidence—including training videos in which Intero trainers told trainee agents, "I love the Do Not Call List, ok, I love it. Because it keeps a lot of our competition out of the market." The main common questions include: (1) did Intero call NDNCR registrants; (2) did Intero make telemarketing calls even though it failed to maintain an internal do not call list; (3) did Intero place calls using prerecorded voices;

(4) did Intero agents place calls before 8 a.m. and after 9 p.m.; and (5) is Intero vicariously liable for its agents' conduct? Because the Court can best resolve all putative class members' claims fairly and efficiently on a class-wide basis, certification is appropriate.

TCPA claims are straightforward and tailor-made for certification. *E.g., Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019), *cert. denied,* No. 19-496, 2019 WL 6833425 (U.S. Dec. 16, 2019) ("The private right of action in [47 U.S.C.] § 227(c)(5) offers many advantages for class-wide adjudication."); *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 629–30 (S.D. Cal. 2015). The TCPA is designed to protect large numbers of consumers from intrusive and predatory calls at home, such as the millions of calls reflected in the record in this case.

## II.    Statement of Issues to Be Decided

The issues to be decided are whether the Classes satisfy the requirements for class certification under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

## III.    Factual Background

### A.    Intero Trains Its Sales Associates to Cold-Call to Generate Real Estate Business.

Intero "is a real estate services company" that "help[s] people buy and sell residential and commercial real estate." *See* Declaration of Sabita J. Soneji ("Soneji Dec."), Ex. A [https://www.intero.com/about-us].[1] Its real estate agents and broker associates (collectively, "sales associates") are in the same business as the company and are responsible for "prospecting" for new real estate business. *See* Video Ex. 2 at 1:06-1:37 ("This is a lead generation business, bottom line, so prospecting should be the most important and most time-consuming activity you do in the business . . . ."). Intero's Interactive Business Plan for its new recruits emphasizes several types of prospecting activities—the first one being "Telemarketing." Ex. C at 10. Intero also provides training on how to generate leads via door-knocking, open houses, social media, and telemarketing. *See, e.g.*, Video Ex. 3 at 00:49-01:39; *id.* at 00:21-00:36 ("[Intero's] got training on every single way that you'll need to go lead generate.").

---

[1] All exhibits cited are exhibits to the Declaration of Sabita J. Soneji. For simplification, exhibit citations will only reference "Ex. XX," or, in the case of video exhibits, "Video Ex. XX."

In fact, Intero prides itself on providing "the best training in the business." *See* Video Ex. 2 1:57-2:07. Each month, Intero provides a three-week-long set of classes as part of the Intero Academy (formerly called Provizio). *Id.* at 1:38-2:07. Intero's training program was developed by co-founder and President John Thompson, *see* Video Ex. 4 at 00:56-01:40, and is led by a dedicated Director of Career Development and Training. *See* Video Ex. 2 at 00:30-01:06. The Intero Academy course is targeted at all new Intero associates, but Intero also encourages all associates to continue to attend Intero trainings, including those at the Academy, throughout their tenures. *See, e.g.*, Video Ex. 4 at 00:00-00:15 (displaying presentation slide that states "INTERO ACADEMY Monthly ongoing agent training for new and seasoned agents"). The program is designed to bring in Intero executives as well as "the best of the best of the best in the industry right now . . . to come in and actually train what they're best at" to help new and seasoned Intero sales associates, alike. Video Ex. 2 at 00:30-01:06. Intero also livestreams its Intero Academy and other "Intero Live" video courses in branch office conference rooms and makes them available on-demand on Facebook. Video Ex. 5 at 01:10-02:14 ("The cool thing about Facebook [Intero] Live … is that when you have agents who are highly successful like Dominic Nicoli or David Troyer or Andy Tse, you know, it's like having your own personal mentor . . . because you can … watch their videos over and over again . . . pick up different things every time."); *see also* Video Ex. 1.

Intero's training specifically teaches Intero sales associates to make cold telemarketing calls. For example, Intero's monthly telemarketing trainings are typically led by Dominic Nicoli, a member of Intero's Hall of Fame and "the best of the best of the best in the industry" at lead generation *via* the telephone. *See* Video Ex. 2 at 4:04-4:34 ("You want to be really good at doing the phones? Go to Dominic Nicoli's class."); Ex. N, Nicoli Dep. at 52:4-22; *see also* Video Exs. 6, 7, and 14.

Intero managers, including every Director of Career Development since at least 2015, routinely commend sales associates to watch Intero's trainings on lead generation. *See, e.g.*, Video Ex. 3 at 00:47-01:10. For example, Mia Kim Park, sales manager and current Director of Recruiting and Training at Intero, "strongly recommend[s]" associates go to telemarketing training led by Intero's "master of lead generation," Mr. Nicoli. Video Ex. 8 at 00:07-01:26. Joe Brown, Intero's former Regional Vice President and current Chief Operating Officer, also directs associates to attend Intero Academy trainings about cold-calling *via* robodialers. Video Ex. 9 at 00:00-00:39. And Intero's associates heed that advice, and

1   the on-demand Intero training classes led by Mr. Nicoli have been viewed thousands of times on Intero

2   Live. *See* Soneji Decl. ¶ 21 & Ex. B.

3       **B.    Intero Trains Its Sales Associates on Who to Call, What to Say, and How to**

4       **Generate More Leads by Using Third Party Services.**

5       Through its Intero Live lead generation classes, Intero trains its sales associates on the ins and

6   outs of phone prospecting, including who to call, how and when to do it, and what to say. General

7   courses on marketing and lead generation highlight the main targets for phone prospecting: associates'

8   centers of influence (family and friends), expired listings, For Sale by Owners ("FSBOs"), geographic

9   farms, just-listed/just-solds (*i.e.*, people with homes close to recent Intero listings or sales), and non-

10  owner-occupied units or absentee owners. *See, e.g.*, Video Ex. 2 at 3:40-4:01; Video Ex. 10 at 1:30-1:49;

11  *see also* Ex. C at 10 (highlighting main targets for real estate telemarketing). Intero's trainers, its Director

12  of Career Development, and its office sales managers also provide sales associates with scripts to learn

13  and follow in prospecting calls. *See, e.g.*, Video Ex. 10 at 00:18-00:32 ("And there's scripts; Jason [Traina]

14  will help you with the scripts."); *id.* at 00:54-01:09 ("Every one of your managers has scripts that will

15  help you."); Video Ex. 7 at 1:27-2:35 ("In the Provizio binder you guys have all the scripts. . . . The stuff

16  that we give you from Provizio is almost all based on Mike Ferry."); Ex. N, Nicoli Dep. at 202:18-203:1.

17      Intero's lead generation trainings also discuss third-party services that sales associates should

18  use to telemarket more efficiently. First, they recommend that sales associates get telephone numbers,

19  including cellphone numbers, to make sales calls to homeowners who have expired or FSBO listings or

20  who live near recent Intero listings from third-party list providers including Landvoice, RedX, Arch

21  Telecom, and Cole Realty—all services that assist in cold-calling prospects. *See* Video Ex. 6 at 1:19-4:08;

22  *see also* Video Ex. 11 at 1:59-2:59 (offering associates free Landvoice trial); Video Ex. 12 at 00:00-00:38;

23  Video Ex. 13 at 00:00-00:28 (recommending new associates share access to Vulcan7, Cole, or RedX to

24  "get on the phone and dial for dollars"). Intero Academy trainings further recommend sales associates

25  use a dialing service that "calls three people at one time, so we get more contacts per hour . . . like what

26  telemarketing companies use." Video Ex. 14 at 00:22-01:14. Specifically, Intero's trainers recommend a

27  company called Mojo Dialing Solutions, which provides a dialing software as well as phone numbers

28  for real estate leads within a specified geographic area. *Id.*; *see also* Video Ex. 15 at 1:43-2:48 (answering

1    Director of Career Development Jason Traina's question about dialing systems); Ex. N,  Nicoli Dep. at

2    100:7–101:3 (Mojo's dialer allows dialing up to three calls at one time).

3          Unsurprisingly, after being trained by Intero that cold-calling is an effective and approved way

4    to lead generate, many Intero sales associates have cold-called using these very recommended third-

5    party services. For example, at least 178 of Intero's California sales associates used Mojo's dialing

6    services during the Class Period to call potential real estate leads. Soneji Decl. ¶ 28. At least 132 of

7    Intero's California sales associates held and used Landvoice accounts to obtain lists of telephone

8    numbers to cold-call during the Class Period. Soneji Decl. ¶ 29. Similarly, at least 150 of Intero's

9    California sales associates held Cole Realty accounts to access targeted lists of numbers to cold-call, and

10   almost every account provided access to multiple sales associates. Soneji Decl. ¶ 30. One-third utilized

11   a feature that would send Cole's lists directly to a dialing service such as Mojo, Vulcan7, or ArchAgent.

12   *Id.* And at least 26 Intero associates in California used Vulcan7's call lead lists or dialer services. Soneji

13   Decl. ¶ 32; Ex. Q, Vong Dep. at 150:18–151:10 (Intero sales associate K. Vong started using the

14   Vulcan7 dialer because he learned that other real estate agents were using the Vulcan7 dialer).

15         Indeed, as one Intero sales associate quipped upon seeing a suspicious device at Intero's

16   Cupertino headquarters, "with how much cold-calling we do, I wouldn't be surprised if an angry

17   solicitee comes in here, and just like drops it off, and decides to blow up Intero HQ." Video Ex. 16 at

18   00:00-00:33.

19       **C.**    **Intero Fails to Comply with the TCPA Yet Reaps Profits from Illegal Calls.**

20         Despite training its sales associates to pursue new real estate business for Intero by

21   telemarketing, Intero failed to ensure compliance with the TCPA's requirements concerning written

22   policies, written procedures, and the recording of phone numbers that Intero may not contact. And

23   throughout the entirety of the class period, Intero never trained its sales associates on compliance with

24   the NDNCR rules or the rules regarding maintenance of an internal do not call list. To the contrary,

25   evidence Intero tried to conceal and destroy endorses or tacitly approves of TCPA violations.

26         In response to Plaintiff's first round discovery asking for all policies, procedures, and training

27   related to compliance with the TCPA and all internal or federal do-not-call lists, Intero stated that it

28   had nothing. *See* Ex. L, Def.'s Resps. to Pl.'s RPDs 4–5. Without such policies, procedures, and training,

Intero is already failing to comply with the TCPA's requirements for a company engaged in telephone sales. *Id.* Indeed, Intero admitted that it did not even start maintaining an internal do not call list until spring 2019. Ex. O, Thompson Dep. at 96:6-101:3, 141:7–143:5, 162:8–15, 163:25–164:12, 170:11–171:8. But even with that new internal DNC list, Intero has never engaged in any training of its sales associates to ensure its sales associates properly use the internal DNC and otherwise comply with the TCPA. Ex. O, Thompson Dep. at 133:21–134:4, 139:16–25, 202:10–21; *see also* Ex. N, Nicoli Dep. at 155:1–3.

Indeed, the opposite is true. Intero's phone prospecting trainings clearly demonstrate Intero's view that it is not necessary for sales associates to comply with TCPA regulations at all. In training videos that Intero hid from Plaintiff (by failing to produce them and then taking them off of its public Facebook training site once Plaintiff started using them in depositions) and then deleted, Intero's main phone prospecting trainer Mr. Nicoli—"the master of lead generation" that Intero managers direct sales associates to for training on lead generation—responds to Intero's sales associates' questions about how to scrub Do Not Call list numbers by stating that scrubbing is an option the third-party services make available, but "the reality" of the TCPA and phone prospecting at Intero is that "we've never had any issue with that ever." Video Ex. 14 at 1:34-2:10.[2] Intero's trainings reassure Intero sales associates who might otherwise remain concerned about TCPA compliance that Mr. Nicoli has "never been reported after making tens of thousands of calls" and "never even heard of anybody being reported" despite belonging to "a big organization of sales people." Video Ex. 6 at 4:12-5:00. In multiple lead generation trainings available for on-demand replay on Intero Live, Mr. Nicoli emphatically states, "I love the Do Not Call List, ok, I love it. Because it keeps a lot of our competition out of the market." *Id.* at 4:32-4:47; *see also* Video Ex. 14 at 1:40-2:05; Ex. N, Nicoli Dep. at 197:16–20 ("We call everybody"

---

[2] Intero's hiding of, failure to preserve, and destruction of evidence concerning these training videos and other content is the subject of Plaintiff's motion for sanctions which Magistrate Judge Cousins denied on procedural grounds. Dkt. Nos. 65 and 68. Because that hidden and deleted content shows Intero leadership posting, endorsing, and responding enthusiastically to trainings about phone prospecting, including prospecting without concern for the TCPA, Plaintiff will seek this Court's review of that determination.

regardless of NDNCR). Similarly, Mr. Nicoli encourages Intero trainees to "call at different times" than Intero's competitors to outcompete them, including "super early in the morning," such as at 7:30 a.m. Video Ex. 6 at 6:30-7:54 ("If [prospective customers] are getting called at the same time [by our competitors], guess what we can do? Call at different times. . . . I can call super early in the morning. . . . You want to get these people before your competition gets in the office. It's like fishing. The people that call the earliest set more appointments.").

Intero's on-demand training on lead generation also advises, based on having "actually read the law," that the TCPA does not apply to Intero sales associates' real estate calls because they are not "selling any products over the phone." Video Ex. 6 at 5:05-5:30. "Really what we're doing," the training advises, "isn't really covered by the Do Not Call list." *Id.*; *see also id.* at 5:30-6:22 (providing more detailed advice regarding how to approach call recipients on the Do Not Call list).

### D. Intero Fostered a Culture of Non-Compliance.

For years, Intero knew about the TCPA violations encouraged in its trainings but did not do anything to limit their spread until after Plaintiff raised the videos at depositions in this case. To the contrary, Intero's managers continued to promote the lead generation trainings to Intero sales associates. *See* III(B), *supra.*

Intero also provided other on-demand training videos on Intero Live featuring other trainers that similarly advised or encouraged Intero sales associates to violate the TCPA when making phone prospecting calls to generate new Intero real estate business. For example, Intero Live also provides an on-demand training by Albert Garibaldi, who, like Mr. Nicoli, is an Intero veteran and top 1% producer who has been extolled for "hammering the phones" and "doing great" at it. Video Ex. 2 at 3:19-3:38. After highlighting that he "prospect[s] for like two hours on the phone" every morning, Mr. Garibaldi explains, "Yeah, there is a Do Not Call list! Guess who I call first? People on the Do Not Call list! Isn't this great? Is there a fine? I think there is. Do I care? No, I don't." Video Ex. 11 at 00:00-00:31. Like the training provided by Mr. Nicoli, Mr. Garibaldi's training brushes over concerns about TCPA compliance. *Id.* ("Have I ever been called out on [disregarding the Do Not Call list]? Maybe once or twice.").

In a training video posted on the Intero Live Facebook page, Intero Vice President (and current

COO) Joe Brown encouraged new sales associates to take Intero's training on cold-calling, including to learn about initiating robocalls to consumers using a triple-line dialer. Video Ex. 9 at 00:00-00:39; Ex. N, Nicoli Dep. at 197:24–200:2.

In another training discussion hosted by leaders of Intero's YPN (Young Professional Network), Intero sales associate Danny Gould presented on the topic of "cold-calling" and recommended that Intero sales associates not only use third-party call list providers, but also use an application called Hushed to hide or mask the number from which they are calling because "the majority of leads, once they figure out what your phone number is, they're going to block you. . . . So then I go on Hushed, [which] sends out like a completely different number, you can choose your area code. So it's like I'm coming from a 408 [area code], now I'm a 650, and I get them on the phone." Video Ex. 13 at 1:27-1:57. Tom Tognoli, Intero's co-founder and President at the time, attended that training event. Ex. P, Gould Dep. at 177:18-178:11. John Thompson, another co-founder and current President, also thinks he attended that YPN event. Ex. O, Thompson Dep. at 180:9-24. YPN also reports on its events to Intero's CEO, Brian Crane. Ex. P, Gould Dep. at 170:20-171:7. But there is no indication that any Intero manager or executive responded to Mr. Gould's recommendations—whether at the event or after the fact on Intero Live—to clarify that spoofing telephone numbers violates the Truth in Caller ID Act, 47 U.S.C. § 227(e). *See* Ex. P, Gould Dep. at 219:24-221:10. Instead, Glen Blackburn, former VP of Career Development and a VP/Managing Officer of Intero at the time of the YPN training event, ratified the shocking training by describing it as "Well done." *See* Exs. E, F.

What is more, Intero's Director of Career Development has actively asked trainers for their third-party dialing software recommendations for the benefit of Intero's sales associates. *See e.g.*, Video Ex. 15 at 1:57-2:08 (Director of Career Development Jason Traina's asking about dialing systems); Video Ex. 12 at 00:08-00:11 (Mr. Traina asking Mr. Garibaldi if he uses "a dialing center"). Indeed, Mr. Traina, the Director of Career Development during most of the Class Period, was a Mojo account-holder and provided access to Mojo to Intero sales associates. Soneji Decl. ¶ 28.

Intero not only ratified Mr. Nicoli's and other trainers' flagrant violations of the TCPA, it encouraged sales associates to follow suit and conduct phone prospecting without regard to TCPA requirements. Intero selected Mr. Nicoli as the go-to trainer on lead generation, chose to publish

1    multiple on-demand training videos featuring Mr. Nicoli's advice without editing out any content,

2    routinely directed Intero sales associates to watch the Intero Academy trainings led by Mr. Nicoli, and

3    failed to provide any disclaimer or clarification as to how the TCPA actually applies to the sales

4    associates' telemarketing activities.

5        Intero sales associates' use of third-party calling services demonstrates that they have largely

6    followed the teachings of the Intero Academy classes concerning prospecting by phone. For example,

7    Landvoice offers customers an option to scrub calling lists of Do Not Call list contacts, but only three

8    of the 132 Intero subscribers opted into this feature. Soneji Decl. ¶ 29. Cole Realty provides a similar

9    option; fewer than a quarter of Intero subscribers ever utilized it. Soneji Decl. ¶ 30.

10       **E.    Intero Associates Placed Hundreds of Thousands of Illegal Telemarketing Calls**

11           **on Intero's Behalf to Tens of Thousands of Consumers, Including Plaintiff.**

12       Mr. Chinitz placed his residential landline number ending in 1899 on the NDNCR on June 28,

13   2003, Ex. H, and he placed his residential VOIP line ending in 6193 on the NDNCR on February 10,

14   2018, Ex. I. *See also* Ex. K, Chinitz Dep. at 120:2–11 (both numbers were "personal, non-business

15   residential numbers"). Mr. Chinitz never gave consent, written or otherwise, to receive telemarketing

16   calls or prerecorded voice calls from Intero associates. Decl. Chinitz ¶ 4.  Mr. Chinitz has never had a

17   business relationship with Intero or any of its sales associates, *id.* at ¶ 5, and he has never provided his

18   contact information to Intero or any of its associates (except in discovery in this suit), *id.* at ¶ 6.

19       Nevertheless, Mr. Chinitz in November 2017 began receiving unsolicited telemarketing calls on

20   both phone numbers by or on behalf of Intero, including telemarketing calls made using artificial voices,

21   calls before 8:00 a.m. and after 9:00 p.m., and calls from a call center, attempting to get him to list his

22   home for sale with Intero. Decl. Chinitz ¶¶ 7-10, 13; Ex. J, Pl.'s Am. Interrog. Resps. 3-5; Verkhovskaya

23   Expert Rep. ¶¶ 76, 78, 107, 109; Ex. K, Chinitz Dep. at 129:25-130:10, 166:9-173:18, 249:15-18, 250:6-

24   10. Mr. Chinitz found the calls intrusive and harassing and repeatedly asked the callers not to call him

25   back, yet they kept calling. Decl. Chinitz ¶¶ 11-12; Ex. J, Pl.'s Am. Interrog. Resps. 6; Ex. K, Chinitz

26   Dep. at 166:9–171:13, 179:8–17. Mr. Chinitz's residential landline phone record (which reflects calls to

27   both numbers) shows that during the period from November 2017 to early 2019, he received over 10

28   calls from telephone numbers that, on information and belief, belonged to Intero sales associates. Ex.

J, Pl.'s Am. Interrog. Resps. 3-5. Call activity records Plaintiff obtained from third-party dialing service Mojo in discovery, which his expert Ms. Verkhovskaya analyzed, confirm he received at least six calls from Intero's California sale associates that used Mojo on his landline ending in 1899 during any 12-month period. Verkhovskaya Expert Rep. ¶¶ 76, 78, 107, 109.

Mr. Chinitz was not alone. In response to Plaintiff's subpoena, Mojo provided a total of 349 (168 plus 181) Excel spreadsheets containing call activity records of Intero's California sales associates that had accounts with Mojo. Soneji Decl. ¶ 28; *see* Verkhovskaya Expert Rep. ¶¶ 8(b), 8(d), 38-39. Plaintiff's expert Anya Verkhovskaya analyzed these records using a methodology successfully used in other TCPA cases. *See generally* Verkhovskaya Expert Rep. Ms. Verkhovskaya determined that based on Mojo's call records alone, 68,918 unique telephone numbers received two or more calls from an Intero California sales associate within any 12-month period when those telephone numbers had been on the NDNCR for at least 31 days prior, for a total 349,067 calls. *Id.* at ¶ 106. She also determined that 122,170 unique telephone numbers received two or more calls from an Intero California sales associate within any 12-month period, for a total of 593,631 calls. *Id.* at ¶ 108. She also determined that 571 unique telephone numbers received, within any 12-month period, two or more calls from an Intero California sales associate before 8 a.m. local time at the call recipient's location or after 9 p.m. local time at the call recipient's location, for a total of 1,410 calls. *Id.* at ¶ 110. Finally she determined 108,137 unique telephone numbers received at least one call from an Intero California sales associate in which the call result was A prerecorded message, for a total of 141,211 calls. *Id.* at ¶ 111.

Furthermore, Intero sales associate Keith Vong admitted to using a ringless voicemail service (i.e., a service that sent recorded messages that went directly to voicemail without the phone ringing) called SlyBroadcast to call roughly 4,000 to 5,000 potential real estate clients. Ex. Q, Vong Dep. at 69:9–72:6; *see also* Ex. J [Interrogatory Responses 5–6] (Mr. Chinitz received two voicemail messages from Mr. Vong, but Mr. Vong denied calling Mr. Chinitz with respect to both voicemails). Other Intero sales associates in a team of 12 people that Mr. Vong led (the "Vong Group") also used similar services such as SlyBroadcast to make prerecorded voice calls prohibited by the TCPA. Ex. Q, Vong Dep. at 41:22–25, 77:7–78:12. Intero manager Robert Cruz was aware that Mr. Vong used these services but never advised him to stop. Ex. Q, Vong Dep. at 65:24–68:9, 80:22–81:7.

Intero has admitted it has no evidence that any person provided express written consent to be called by any Intero sales associate. Ex. O, Thompson Dep. at 143:6–144:16.

**IV.    Statutory Background of the Class Members' Claims**

The Telephone Consumer Protection Act exists precisely to stop unwanted telemarketing calls like those described above and to protect the privacy of citizens like Mr. Chinitz and the Class members. *See, e.g.*, *Duguid v. Facebook, Inc.*, No. 17-15320, 2019 WL 2454853 (9th Cir. June 13, 2019) ("Congress enacted the TCPA to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls.'").

Congress authorized the Federal Communications Commission to establish a national database of consumers who object to receiving telephone solicitations, the National Do Not Call Registry. 27 Pub. L. No. 102–243, § 3. The NDNCR is a list containing the residential and wireless telephone numbers of individuals who affirmatively indicate they do not wish to receive unsolicited calls from commercial telemarketers. 47 C.F.R. § 64.1200(c)(2) and (e). Today, 230 million numbers on are the NDNCR.

The TCPA prohibits entities from making telephone solicitations to people who have registered their telephone numbers on the NDNCR. *Id.* An entity can demonstrate it is not liable for calls made to numbers on the NDNCR only if it can show either that (i) the registrant provided prior express written consent to receive the calls in a signed, written agreement or (ii) the violation was the result of error, and that, as part of its routine business practice, the entity maintains written procedures to comply with the federal regulations, trains its personnel in these procedures, maintains a list of numbers that may not be called, and uses a version of the national DNC list that is no more than 31 days old. 47 C.F.R. § 64.1200(c)(2)(i)-(ii).

TCPA regulations also prohibit any telemarketing call "unless such [entity] has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on behalf of that [company]." *Id.* § 64.1200(d) and (e). The "minimum standards" for these procedures include training of personnel engaged in marketing on the existence and use of an internal do-not-call list, placing an individual's phone number on that internal do-not-call list, and honoring that request within no more than 30 days of its receipt. *Id.* An entity violates the TCPA if it initiates a "phone call

without having implemented the minimum procedures." *Wagner v. CLC Resorts & Developments, Inc.*, 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014) (quoting *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632 (6th Cir. 2009)). The TCPA "is essentially a strict liability statute" that does not require intent. *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. 15-cv-02057-FMO-SP, 2017 WL 5720548, at *3 (C.D. Cal. Nov. 6, 2017).

An entity cannot escape liability by arguing it did not directly place the calls itself. Vicarious liability is well settled under the TCPA for all calls "by or on behalf of the same entity in violation of the regulations." 47 U.S.C. § 227(c)(5). Under FCC's TCPA regulations, vicarious liability may be based on the principles of apparent authority, actual authority, and ratification, or, under the express terms of § 227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013); *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073, 1076 (9th Cir. 2019) (finding student loan company vicariously liable under the TCPA for debt collector's calls because company had actual knowledge of unlawful calls and made no effort to stop them).

## V.    The Court Should Certify the Proposed Classes

To support his request for certification of the proposed Classes, Plaintiff must demonstrate "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Rule 23(a) sets forth four conjunctive prerequisites that must be met for any class: (1) commonality, (2) numerosity, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Because Plaintiff seeks hybrid damages and injunctive class certification here, each Class must also meet the two additional requirements of 23(b)(3), predominance and superiority, and warrant injunctive relief under 23(b)(2). Fed. R. Civ. P. 23(b)(2)-(3).

In addition, a class definition must allow the court to readily identify the class members by reference to objective criteria. *J.L. v. Cissna*, No. 18-cv-04914-NC, 2019 WL 415579, at *7 (N.D. Cal. Feb. 1, 2019). Mr. Chinitz seeks certification of the following classes under Rule 23(a), (b)(2), and (b)(3):

**National Do Not Call Registry Class ("DNC Class")**: All persons in the United States who: (a) received more than one call made on behalf of Intero by, or on behalf of, one of Intero's California sales associates; (b) promoting Intero's goods or services; (c) in a 12-

month period; (d) on their non-business telephone lines; (e) whose telephone number(s) were on the NDNCR for at least 31 days; (f) at any time since September 13, 2014.

**Internal Do Not Call Class ("Internal DNC Class")**: All persons in the United States who: (a) were on an internal list of persons who asked Intero not to call them ("Internal DNC List"), (b) received more than one call made on behalf of Intero by, or on behalf of, one of Intero's California sales associates; (c) promoting Intero's goods or services; (d) in a 12-month period; (e) on their non-business telephone line; (f) at any time since September 14, 2014.

**Early/Late Calls Class**: All persons in the United States who: (a) received one more more telemarketing call made on behalf of Intero by, or on behalf of, one of Intero's California sales associates; (b) on their non-business telephone line; (c) before 8 a.m. or after 9 p.m. (local time, recipient's location); (d) at any time since September 13, 2014.

**Artificial or Prerecorded Message Residential Class ("Prerecorded Message Class")**: All persons in the United States to whom: (a) a California Intero sales associate, or a person/entity acting on behalf of a California Intero sales associate, initiated on Intero's behalf one or more non-emergency telephone calls; (b) promoting Intero's goods or services; (c) to the recipient's non-business telephone line; (d) through the use of an artificial or prerecorded voice; (e) at any time since September 13, 2014.

Collectively, the DNC Class, the Internal DNC Class, the Early/Late Calls Class, and the Prerecorded Message Class are the "Class" or the "Classes."

These classes are objectively defined and will allow the Court to readily identify members. Although the Ninth Circuit has expressly rejected an ascertainability requirement at the class certification stage, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017), in this case many Class members have already been identified. For example, Plaintiff's expert's analysis of Mojo's call records for Intero's California corporate sales associates identified over 68,000 members of the DNC Class with over 349,000 actual violations. Verkhovskaya Expert Rep. ¶¶ 106, 112-14; *see supra* p. 10.

### A.    Common Questions Predominate.

The commonality requirement under Rule 23(a) "requires the plaintiff to demonstrate that the

1  class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)

2  (citation omitted). The "claims must depend on a common contention" that is "capable of classwide

3  resolution—which means that determination of its truth or falsity will resolve an issue that is central to

4  the validity of each one of the claims in one stroke." *Id.* Commonality "is a 'relatively light burden' that

5  'does not require that all the questions of law and fact raised by the dispute be common . . . or that the

6  common questions of law or fact predominate over individual issues.'" *Esparza v. SmartPay Leasing, Inc.*,

7  No. 17-cv-03421-WHA, 2019 WL 2372447, at *2 (N.D. Cal. June 5, 2019). This inquiry often overlaps

8  in significant part with the predominance inquiry under Rule 23(b)(3). *Wolin v. Jaguar Land Rover North*

9  *America, LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). The predominance requirement tests whether

10  "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Torres v. Mercer*

11  *Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citation omitted), by testing whether "the main issues

12  in a case" present common or individualized issues. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180,

13  1189 (9th Cir. 2001). "An individual question is one 'where members of a proposed class will need to

14  present evidence that varies from member to member,' while a common question is one where 'the

15  same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to

16  generalized, class-wide proof.'" *Tyson Foods v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 2 W.

17  Rubenstein, Newberg on Class Actions § 4:50, 196–97 (5th ed. 2012)); *Torres*, 835 F.3d at 1134 (same).

18  "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the

19  predominance analysis over individualized questions which are of considerably less significance to the

20  claims of the class." *Torres*, 835 F.3d at 1134.

21        Here, common questions will drive the resolution of the class members' TCPA claims. The

22  most important common questions, across the four classes, include: (1) whether Intero's California

23  sales associates, or dialing services they engaged, called numbers on the NDNCR; (2) whether Intero's

24  California operations failed to comply with the TCPA's internal do not call rules; (3) whether Intero's

25  California sales associates, or dialing services they engaged, called residential and mobile numbers before

26  8 a.m. or after 9 p.m. (local time at the call recipient's location); (4) whether Intero's California sales

27  associates, or dialing services they engaged, placed calls to residential and mobile numbers using an

28  artificial voice or prerecorded message; (5) whether the telemarketing calls by Intero's California sales

associates were intended to encourage the purchase of Intero's services; and (6) whether Intero is liable for the telemarketing conduct of its California sales associates.

These significant questions predominate and will all be proven using evidence common to the Classes, primarily evidence about the conduct of Intero and its sales associates who made calls on Intero's behalf. *See, e.g.*, *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *6–7 (N.D. Cal. May 5, 2017) ("*Abante Rooter*"); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (finding that vicarious liability question met commonality requirement because actual authority depended on relationships among defendants, ratification depended on defendants' conduct, and apparent authority depended on objective reasonable person analysis); *Whitaker v. Bennett Law, PLLC*, No. 13-cv-03145-L-NLS, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014) (commonality met where "[t]he core issue to be resolved" was whether defendant used a prerecorded or artificial voice message to make unsolicited calls). TCPA claims, by their nature, involve large numbers of plaintiffs and a common course of conduct that affected each class member in the same way. *See, e.g., Krakauer*, 925 at 655-56 ("The problems that so often plague class actions under Rule 23(b)(3) are wholly absent from this scheme. . . . Put simply, a plaintiff suing under § 227(c)(5) is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim.").

**1.    Common evidence will show that Intero sales associates made calls that violate the TCPA.**

To prove the claim asserted by the NDNCR Class, Mr. Chinitz must establish that (1) more than one telephone solicitation call was made on behalf of Intero (2) within a 12-month period (3) to a non-business number that was placed on the NDNCR at least 31 days before the call was made. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2) and (e). Common records from third-party dialing services evidence millions of calls made by Intero's California sales associates in pursuit of more real estate business on behalf of Intero. Plaintiff's expert has reviewed the Mojo call records presently in Plaintiff's possession against historical NDNCR records. Ms. Verkhovskaya's analysis has determined over 68,000 unique telephone numbers received over 349,000 calls that violate § 64.1200(c)(2) and (e). *See* Verkhovskaya Expert Rep. ¶ 106; *see supra* p. 10.

For the claims of the Internal DNC Class, Mr. Chinitz must establish that (1) more than one call for telemarketing purposes was made on behalf of Intero (2) within a 12-month period (3) to a non-business telephone subscriber (4) without Intero sufficiently instituting procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of Intero. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d) and (e). Beyond the evidence cited above, Mr. Chinitz will also use common evidence to show that Intero did not sufficiently implement a company-specific do not call list. For example, Intero's Rule 30(b)(6) witness admitted that Intero did not compile any internal Do Not Call list until spring 2019. Ex. O, Thompson Dep. at 162:2-15. Intero also did not have any policies or measures in place to ensure that its sales associates provided Intero with company-specific requests not to be called. Ex. S, Wang Dep. 72:16-21 (claiming no knowledge and "no way to find out" if sales associates receive internal do-not-call requests); *id.* 82:1-83:22 (no training or systems directing Intero staff to report complaints about unwanted calls to legal). If Intero failed to adequately implement an internal do not call list, every one of its marketing calls violate 47 C.F.R. § 64.1200(d) and (e).

For the claims of the Prerecorded Message Class, Mr. Chinitz must establish that: (1) a residential or mobile telephone number was called on Intero's behalf (2) using an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(B). Plaintiff will use common evidence from subpoenaed third-party calling services that indicates when Intero sales associates made calls using artificial or prerecorded voices. As one example, records produced by Mojo Dialing Solutions indicate over 108,000 call records where Intero sales associates "dropped" pre-recorded voicemail messages. *See* Verkhovskaya Expert Rep. ¶ 111; *see supra* p. 10. The Mojo dialing service further played pre-recorded messages to live answers whenever an Intero sales associate using Mojo's triple-line dialer was already engaged on another call. *See* Ex. G.

Finally, with respect to the Early- and Late-Call Class, Mr. Chinitz must establish that a telemarketing call was made "before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location)." 47 C.F.R. § 64.1200(c)(1) and (e). Common evidence from third-party dialing services used by Intero sales associates will indicate the scope of Intero's liability. The records from third party Mojo, for example, reveal 1,410 early and late calls made in the Class period. Verkhovskaya Expert Rep. ¶ 110.

1

       **2.**     **Common evidence will show those calls were made on Intero's behalf.**

2

      For each of these four class claims, common evidence indicates that all these cold-calls were

3

made on Intero's behalf. Intero trained its sales associates to help them generate leads, including by

4

cold-calling, because each lead could lead to someone buying or selling a house with Intero, which

5

would result in revenue for Defendant. Intero reaps a significant part of the reward for its associates'

6

prospecting activities; for every lead generated and converted into a real estate transaction, Intero takes

7

up to 50% of the commission before paying the sales associate the remainder. *E.g.*, Ex M. For that

8

reason, Intero emphasizes that the Intero "brand" is unique and offers something valuable to its

9

customers and trains its sales associates to emphasize that brand when trying to solicit business. Ex. R,

10

Tognoli Dep. at 150:9-155:15. Moreover, Intero's standard contracts with its sales associates indicate

11

that "all agreements, acts or actions for performance of licensed activity, [including] advertisements, . .

12

. shall be taken and performed in the name of [Intero]." *See, e.g.*, Ex. M. The standardized agreements

13

further require that associates "work diligently. . . .to solicit additional listings, clients and customers . .

14

. to the end that [Intero] and [associates] may derive the greatest benefit possible." *Id.*

15

       **3.**     **Common evidence will show that Intero knew about or was willfully**

16

               **ignorant of its sales associates' TCPA violations.**

17

      For all of these claims, common evidence will show Intero's paltry compliance measures, and

18

other "actions demonstrate[] indifference to ongoing violations and a conscious disregard for

19

compliance with the law." *Krakauer*, 925 F.3d at 662. For instance, prior to spring 2019, Intero did not

20

maintain an internal DNC list, even though its Intero Live training platform provided myriad other

21

phone prospecting resources to its sales associates. Ex. O, Thompson Dep. at 163:25-164:12; *see also*

22

Ex. S, Wang Dep. at 87:1-20. Further, although Intero sent some emails to all of its sales associates

23

directing them not to contact certain individuals who asked not to be called, or not to use certain third-

24

party calling services, it took no steps to actually enforce those requests. And, instead of teaching and

25

enforcing TCPA compliance, Intero provided its sales associates with many trainings that openly

26

promoted phone prospecting activities that violated the TCPA. *See* Section III(B)-(D), *supra*; *see also* Ex.

27

O, Thompson Dep. at 194:1-21. These Intero trainings not only promoted non-compliance with federal

28

and internal Do Not Call list requirements, but also with other TCPA regulations, including prohibitions

on early and late calls, prerecorded messages, and caller ID spoofing. *E.g.*, Video Ex. 6 at 6:30-7:54 (promoting calling expired listings at "creative" times, including  as early as 7:30 in the morning or late at night); Video Ex. 11 at 1:04-1:22 (roleplaying expired listing call and highlighting that he calls the expired listing at 7:30 in the morning); Video Ex. 13 at 1:27-1:57 (promoting Hushed application to spoof telephone numbers). Intero admitted it was "aware that Intero real estate agents are using dialing services including Landvoice, RedX, Cole Realty, and Mojo" but has taken no steps to prevent or discourage Intero sales associates from using these services. Ex O, Thompson Dep. at 92:19–96:4; *see* Ex. N, Nicoli Dep. at 86:14–20 (Tom Tognoli was aware that Nicoli taught an Intero training on phone prospecting).

### 4.    Intero will mount common defenses to the claims of all Class members.

In response to the overwhelming evidence of wrongdoing by its sales associates, Intero's primary defense—and indeed its only defense—has been that all its sales associates are "independent contractors," for whom Intero bears no responsibility. Even if it were true that an employer could "independent contract" tort liability away by simply changing the title and benefits of its employees—and it is absolutely not—that question would be addressed by common legal analysis and common proof for all Class members alike.

To begin, as a matter of law, Intero's California sales associates are Intero's agents for purposes of tort liability, *Gipson v. Davis Realty Co.*, 30 Cal. Rptr. 253, 262 (Ct. App. 1963), and the TCPA is a "statutory tort." Under California law, "for purposes of liability to third parties for torts, a real estate salesperson is the agent of the broker who employs him or her," and "[t]he broker is liable as a matter of law for all damages caused to third persons by the tortious acts of the salesperson committed within the course and scope of employment." *In re King St. Investments, Inc.*, 219 B.R. 848, 856 n.12 (B.A.P. 9th Cir. 1998). "Additionally, although [the salesperson's] contract with [the broker] stated that [the salesperson] is an independent contractor, this provision does not change the relationship between real estate broker and agent for purposes of vicarious liability." *Id.* Indeed, "any provision in a contract which purports to change [the relationship between real estate agent and broker] from that of an agent to independent contractor is invalid as being contrary to law for purposes of tort liability to third parties." *California Real Estate Loans, Inc. v. Wallace*, 23 Cal. Rptr. 2d 462, 466 n.2 (Ct. App. 1993); *see also*

Cal. Bus. & Prof. Code § 10010.5(b)(2) ("[A] responsible broker is liable for the actions or negligence of a salesperson or broker associate retained by the responsible broker to perform acts for which a license is required under this division."); *id.* § 10032(a) ("[A]ll other obligations of brokers and real estate salespersons to members of the public shall apply regardless of whether the real estate salesperson and the broker to whom he or she is licensed have characterized their relationship as one of 'independent contractor.'").

Were that not enough, whether Intero is vicariously liable under more general common law principles of agency is also susceptible to common proof. For example, whether Intero ratified its sales associates' phone prospecting activities can be answered by common proof indicating that Intero had "knowledge of material facts" or "actual knowledge" of its sales associates' calling practices and accepted the benefit of those practices. *Id.* at 1074. Alternatively, common evidence indicates Intero's ratification of its sales associates' TCPA violations through its willful ignorance. This form of ratification requires showing that Intero "had knowledge of facts that would have led a reasonable person to investigate further." *Id.* Despite the evidence of pervasive calling practices that might violate the TCPA, Intero managers did not investigate and, instead, "continued to accept the benefits" of its associates' cold-calling and remained silent about legal obligations under the TCPA. *Id.*

Further, whether Intero is liable for its sales associates' acts under a theory of apparent agency, Restatement (Third) of Agency (Restatement) § 2.03, cmt. a, likewise presents a common question. Each class member who received an unwanted call from Intero's sales associates "naturally and reasonably assume[d] that the agent ha[d] authority to do acts consistent with the agent's position," such as to make or coordinate marketing calls on behalf of Intero. Restatement § 3.03, cmt. b.

Whether Intero is liable under a theory of *respondeat superior* is also susceptible to common proof. Courts in the Ninth Circuit consider various factors to determine whether a principal has enough authority to control their agents to invoke *respondeat superior* liability. *See Jones v. Royal Admin. Servs.*, Inc., 887 F.3d 443, 450 (9th Cir. 2018) (listing ten, non-exhaustive factors). As described above, and as Intero's contracts with its associates recognize, *e.g.*, IN 0050, one of the areas that Intero *must* supervise and control under California law is the "[a]dvertising of any service for which a license is required," *e.g.*, calls to solicit real estate transaction business. Cal. Code Regs. tit. 10, § 2725. To argue that Intero does

not sufficiently control some or all of its corporate associates in this regard is tantamount to arguing that Intero does not comply with California real estate law with respect to those associates. Moreover, common evidence will show that Intero did in fact have and exercise significant control over its sales associates, who are all engaged Intero's core business: real estate sales. *E.g.*, Ex. Q, Vong Dep. at 32:9–33:5 (Intero provides its sales associates with technology tools), 34:19–39:6 and 169:12-15 (discussing Intero's provision of "accountability" and other software fot its sales associates), 117:9–118:3 (Intero supervises Vong's real estate transactions); Ex. O, Thomson Dep. at 85:15–89:20 (Intero provides extensive training through Intero Academy and Intero Live).

In sum, Intero's potential vicarious liability defense presents a common question. Vicarious liability under the TCPA does not depend on whether a sales associate is deemed an independent contractor or employee; rather all that matters is whether an agency relationship exists between Intero and its sales associates. *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019). The FTC and FCC have recognized that imposing vicarious liability serves the TCPA's consumer protection goals **especially** where "[s]ellers may have thousands of 'independent' marketers" such that "suing one or a few of [the marketers directly] is unlikely to make a substantive difference for consumer privacy." *In re Dish Network*, LLC, 28 F.C.C. Rcd. 6574, 6588 (2013) (quoting FTC Comments) (internal quotation marks omitted). As described above, regardless of the theory, this question of agency will be answered on a common basis for all class members.

### 5.    Class wide relief can be proven on a common basis.

Class-wide damages can be proven on a common basis, as required under *Comcast v. Behrend*, 569 U.S. 27 (2013). To satisfy the requirements of Rule 23(b)(3), Plaintiff "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *See, e.g., Pulaski v. Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015). "To satisfy this requirement, plaintiffs must show that 'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (citations omitted). Here, class members' damages all derive from the same event: Intero's sales associates' pervasive and continuing practice of making lead generation calls that violate the TCPA. Damages can be calculated

easily by using Plaintiff's expert's analysis of the data, and determination of the number of calls made in violation of the TCPA within the relevant timeframe multiplied by the damages provided by the statute. *See* Verkhovskaya Expert Rep. ¶¶ 105-11.

### B.  All Other Requirements of FRCP 23(a), 23(b)(2), and 23(b)(3) Are Met.

#### 1.  The Proposed Classes Are Sufficiently Numerous.

A class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Plaintiff "need not state an exact number to meet the threshold requirements of Rule 23." *Abante Rooter*, 2017 WL 1806583, at *8. "Rather, the rule 'requires examination of the specific facts of each case and imposes no absolute limitations.'" *Id.* "A class or subclass with more than 40 members 'raises a presumption of impracticability based on numbers alone.'" *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015). "In analyzing numerosity 'a court may make common-sense assumptions and reasonable inferences.'" *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017).

Mr. Chinitz's expert, Anya Verkhovskaya, has analyzed telephone records that Mr. Chinitz obtained in discovery from just one third party source, Mojo, that show the DNC Class has at least 68,918 members. Verkhovskaya Expert Rep. ¶ 106. Ms. Verkhovskaya's analysis establishes numerosity is met for the DNC Class.

Ms. Verkhovskaya's analysis of Mojo's records show that the Internal DNC Class has at least 122,170 members. Verkhovskaya Expert Rep. ¶ 108. Because Intero has not instituted written procedures and training of its sales associates regarding an internal do not call list in accordance with TCPA regulations, all of these calls are illegal under the TCPA. 47 C.F.R. § 64.1200(d)-(e) ("No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."). Thus, numerosity is easily satisfied.

Likewise, Ms. Verkhovskaya's analysis of Mojo's records shows the Early/Late Calls Class has over 571 members. Verkhovskaya Expert Rep. ¶ 110.

Finally, Mojo's records show the Prerecorded Message Class has over 108,137 members.  For

example, Mojo's records indicate over 141,000 calls in which an Intero associate dropped a pre-recorded message on a person's voicemail or answering machine. Verkhovskaya Expert Rep. ¶ 110; Ex. G.

### 1. Plaintiff's Claims Are Typical of the Class Members' Claims.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Typicality exists when the class representatives and the class members are subjected to and injured by the same course of conduct. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011). "[T]he claims need only be 'reasonably co-extensive with those of absent class members,' rather than 'substantially identical.'" *True Health Chiropractic Inc. v. McKesson Corp.*, 332 F.R.D. 589, 606 (N.D. Cal. 2019)

Mr. Chinitz's claims arise from the same course of conduct as the Class members' claims. Mr. Chinitz, like all DNC Class members, received telemarketing calls from Intero's California sales associates, or dialing services acting on their behalf, at a residential telephone number that was registered on the NDNCR. *See supra* pp. 9-10. Like all Internal DNC Class members, Mr. Chinitz received telemarketing calls from Intero's California sales associates, or dialing services acting on their behalf, when Intero failed to comply with the TCPA's rules related to maintenance of an internal do not call list. *Id.* Like all Early/Late Calls Class members, Mr. Chinitz received telemarketing calls from Intero's California sales associates, or dialing services acting on their behalf, before 8 a.m. or after 9 p.m. local time at his location. *Id.* And like all Prerecorded Message Class members, Mr. Chinitz received telephone calls on his residential telephone line that used an artificial or prerecorded voice, which were made for the purpose of promoting Intero's real estate services. *Id.* For all of these reasons, typicality is satisfied.

### 2. Mr. Chinitz and his Counsel Adequately Represent the Class Members.

Rule 23(a)'s final requirement is that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The Court must address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other putative class

members, and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the proposed class." *True Health II*, 332 F.R.D. at 608; *accord Nevarez v. Forty Niners Football Co.*, 326 F.R.D. 562, 581 (N.D. Cal. 2018). Representation is adequate "when the attorneys representing the class are qualified and competent, and the class representatives are not disqualified by interests antagonistic to the remainder of the class." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *4 (N.D. Cal. Dec. 23, 2010).

Here, both requirements are met. As to the first prong, there are no conflicts of interest between Mr. Chinitz and the absent Class members. Mr. Chinitz suffered the same type of violations as the other members of the Class, and he has an appropriate incentive to seek damages for those violations on behalf of the Class. *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 487 (N.D. Cal. 2011). Moreover, Plaintiff and his counsel are "qualified and competent" to represent the Class, *In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *4, and have demonstrated their commitment to this case through intensive discovery and independent investigation to date.

In addition, Plaintiff's attorneys satisfy all three factors that Rule 23(g)(1) requires the Court to consider in appointing class counsel. Both firms have substantial experience litigating class actions asserting TCPA claims and have been appointed by courts as class counsel in many prior cases. Ex. T (Tycko & Zavareei LLP firm resume); Ex. U (Reese LLP firm resume). Mr. Chinitz's counsel Hassan Zavareei has also testified before Congress on the importance of the TCPA and presented at numerous continuing legal education events on that topic. Ex. T. Finally, counsel have already committed and will continue to commit substantial resources to litigating this case. Any certified Classes will be in capable and dedicated hands with these two firms.

### 3. The Requirements of Rule 23(b)(2) Are Met.

Rule 23(b)(2) requires a plaintiff to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). To meet the requirements of (b)(2), plaintiff must only make a showing of cohesiveness of the class claims, *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998), and show that "class members seek uniform relief from a practice applicable to all of them," *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

Here, Intero acted on grounds that apply generally to all of the Classes by (1) making telemarketing calls to numbers on the NDNCR (or being responsible for telemarketing calls to numbers on the NDNCR); (2) failing to maintain minimum standards related to an internal do-not-call list before making telemarketing calls; and (3) making calls to telephone lines using an artificial or prerecorded voice (or being responsible for calls to telephone lines using an artificial or prerecorded voice). There is a single result that would provide relief to every member of the Class: injunctive relief requiring Intero not to make calls to phone numbers on the NDNCR (for the DNC Class); to create and maintain minimum standards with respect to its internal do not call list (for the Internal DNC Class); not to make calls to residential phone numbers using artificial or prerecorded voices (for the Prerecorded Message Class); and not to make calls to residential phone numbers before 8 a.m. or after 9 p.m. (for the Early/Late Calls Class).

### 4.    A Class Action Is the Superior Method of Resolving Mr. Chinitz's and the Class Members' TCPA Claims.

"[T]he purpose of [Rule 23(b)(3)'s] superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175; FED. R. CIV. P. 23(b)(3)(A)–(D). Superiority is met here.

First, the Class members have little interest in individually controlling litigation against Intero because, although the invasion of privacy and nuisance these persistent unwanted calls pose is significant, they are small compared to the enormous cost of litigation. As a result, a class action is the most practical method of adjudicating their claims. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). While not insignificant, courts routinely find that the statutory TCPA damages of $500 to $1500 dollars "is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action against a national corporation." *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 571 (W.D. WA 2012).

In addition, "class certification promotes consistency of results, giving Defendant[] the benefit of finality and repose." *Combe v. Intermark Comm'ns, Inc.*, No. CV0909127SJOPJWX, 2010 WL

11597517, at *10 (C.D. Cal. Nov. 18, 2010). Indeed, one federal court in this Circuit found a TCPA case "highlights one of the strongest justifications for the class action device: its regulatory function . . . [as] individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute." *Bee, Denning, Inc.*, 310 F.R.D. at 630. Furthermore, class certification here will avoid duplicative results by unifying numerous common issues of law and fact, as described above. *See* Section V(A), *supra*.

Finally, this TCPA case is manageable. Given the predominance of common issues and defenses, *see* Section V(A), *supra*, the case can be tried almost entirely using class-wide proof, and "the scope of the class action will not be much greater than if [Plaintiff] were to pursue his claims on an individual basis. *Etzelsberger v. Fisker Auto., Inc.*, 300 F.R.D. 378, 385 (C.D. Cal. 2013). It is "far more efficient" to litigate Mr. Chinitz's claims based on a common course of conduct "on a classwide basis rather than in thousands of individual and overlapping lawsuits." *Wolin*, 617 F.3d at 1176; *see also Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2017 WL 558017, at *4 (N.D. Cal. Feb. 10, 2017). To further streamline the case, Plaintiff seeks only certification of a class of those individuals called by Intero sales associates in California, which should eliminate choice of law disputes.

## VI.    Conclusion

For the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Class Certification pursuant to Rules 23(a), 23(b)(2), and 23(b)(3); certify the DNC, Internal DNC, Early/Late Calls, and Prerecorded Message Classes; and appoint Tycko & Zavareei LLP and Reese LLP as class counsel.

1

2    Dated:        January 17, 2020

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TYCKO & ZAVAREEI LLP**

_____/s/ Sabita J. Soneji_____
Sabita J. Soneji

Sabita J. Soneji (State Bar No. 224262)
_ssoneji@tzlegal.com_
V Chai Oliver Prentice (
_vprentice@tzlegal.com_
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

Hassan A. Zavareei (State Bar No.
181547)
_hzavareei@tzlegal.com_
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

**REESE LLP**
George V. Granade (State Bar No.
316050)
_ggranade@reesellp.com_
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

Michael R. Reese (State Bar No. 206773)
_mreese@reesellp.com_
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

_Attorneys for Plaintiff Ronald Chinitz and the
Proposed Plaintiff Class_