1  Sabita J. Soneji (State Bar No. 224262)
   *ssoneji@tzlegal.com*
2  **TYCKO & ZAVAREEI LLP**
   1970 Broadway, Suite 1070
3  Oakland, California 94612
   Telephone: (510) 254-6808
4  Facsimile: (202) 973-0950

5  George V. Granade (State Bar No. 316050)
   *ggranade@reesellp.com*
6  **REESE LLP**
   8484 Wilshire Boulevard, Suite 515
7  Los Angeles, California 90211
   Telephone: (310) 393-0070
8  Facsimile: (212) 253-4272

   Michael R. Reese (State Bar No. 206773)
   *mreese@reesellp.com*
   Carlos F. Ramirez (admitted *pro hac vice*)
   **REESE LLP**
   100 West 93rd Street, 16th Floor
   New York, New York 10025
   Telephone: (212) 643-0500
   Facsimile: (212) 253-4272

   Hassan A. Zavareei (State Bar No. 181547)
   *hzavareei@tzlegal.com*
   Kristen G. Simplicio (State Bar No. 263291)
   *ksimplicio@tzlegal.com*
   Mark A. Clifford (*pro hac vice*)
   *mclifford@tzlegal.com*
   **TYCKO & ZAVAREEI LLP**
   1828 L Street, Northwest, Suite 1000
   Washington, District of Columbia 20036
   Telephone: (202) 973-0900
   Facsimile: (202) 973-0950

11
12  *Counsel for Plaintiff Ronald Chinitz*
    *and the Proposed Class*

13            **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
14               **SAN JOSE DIVISION**

15  RONALD CHINITZ, individually and on          Case No. 5:18-cv-05623-BLF
    behalf of all others similarly situated,
16                                               **PLAINTIFF RONALD CHINITZ'S REPLY**
                              Plaintiff,         **IN SUPPORT OF MOTION FOR CLASS**
17                                               **CERTIFICATION**
              vs.
18
    INTERO REAL ESTATE SERVICES,
19                                               Date: July 2, 2020
                              Defendant.         Time: 9:00 a.m.
20                                               Place: Courtroom 5, 4th Floor
                                                 Judge: Honorable Beth Labson Freeman
21
22                                               Complaint Filed: September 13, 2018
                                                 Trial Date: April 5, 2021
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................1

II.   Argument .......................................................................................................2

      A.   The Narrowed Classes Eliminate Any Arguable Overbreadth. .......................................2

      B.   Intero Offers No Legitimate Objection To Verkhovskaya's Report. ...........................3

           1.   Courts around the country have accepted Verkhovskaya's testimony
                in the face of attacks like those Intero raises here..............................................3

           2.   No weight should be afforded to Taylor's and Sponsler's
                declarations...........................................................................................5

           3.   The Court has already rejected Intero's Rule 37 argument.................................6

      C.   Mr. Chinitz Has Submitted Evidence Establishing All Rule 23(a) Factors....................7

           1.   Numerosity is met. .................................................................................7

           2.   Commonality is met..............................................................................7

           3.   Typicality and adequacy are met...........................................................8

      D.   The Court Should Certify the DNC Class under Rule 23(b)(3)...............................8

           1.   Intero's agency arguments reveal common, predominant issues. .....................8

           2.   Verkhovskaya's report proves TCPA violations on a classwide basis...........11

                a.   At this stage, Mr. Chinitz need not identify all class members. .........11

                b.   Mr. Chinitz can prove Intero dialed residential numbers on a
                     classwide basis. .......................................................................13

           3.   Intero's speculation as to individual issues affecting the DNC Class
                does not defeat predominance. ...........................................................14

      E.   The Court Should Certify the Classes under Rule 23(b)(2). ...........................15

III.  Conclusion ...................................................................................................15

1

# TABLE OF AUTHORITIES

2

**CASES**

3

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
   No. 15-cv-06314-YGR, 2017 WL 1806583 (N.D. Cal. May 5, 2017) ........................................2, 4, 13

4

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
   No. 15-cv-06314-YGR, 2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ................................................. 3

5

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ........................................................................................................................... 15

7

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) .......................................................................................................... 7

8

*Avila v. Willits Envtl. Remediation Tr.*,
   633 F.3d 828 (9th Cir. 2011) ................................................................................................................ 6

10

*Bakov v. Consolidated World Travel, Inc.*,
   No. 15-cv-02980, 2019 WL 1294659 (N.D. Ill. 2019) ......................................................................... 7

11

*Booth v. Appstack*,
   No. 13-cv-1533-JLR, 2016 WL 3030256 (W.D. Wash. May 24, 2016) ..........................................7, 12

13

*Braver v. Northstar Alarm Servs., LLC*,
   329 F.R.D. 320 (W.D. Okla. 2018) ..................................................................................................... 13

15

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ............................................................................................................ 11

16

*California Real Estate Loans, Inc. v. Wallace*,
   23 Cal. Rptr. 2d 462 (Ct. App. 1993) ................................................................................................... 9

17

*Chinitz v. NRT West, Inc.*,
   No. 18-cv-06100-NC, 2019 WL 4142044 (N.D. Cal. Aug. 30, 2019) ................................................. 9

19

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*,
   317 F.R.D. 91 (N.D. Cal. 2016) ........................................................................................................... 7

21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................................................................................. 3

22

*Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*,
   No. EDCV130646JGBSPX, 2014 WL 10988092 (C.D. Cal. July 30, 2014) ....................................... 6

23

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ................................................................................................................ 6

25

*Henderson v. United Student Aid Funds, Inc.*,
   918 F.3d 1068 (9th Cir. 2019) .......................................................................................................9, 11

26

*In re King St. Investments, Inc.*,
   219 B.R. 848 (B.A.P. 9th Cir. 1998) .................................................................................................... 8

27

28

*Johnson v. Comodo Grp., Inc.*,
    No. 16-cv-04469-SDW-LDW, 2020 WL 525898 (D.N.J. Jan. 31, 2020) ........................... 3

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ........................................................................................................... 9

*Krakauer v. Dish Network L.L.C.*,
    311 F.R.D. 384 (M.D.N.C. 2015) ...................................................................... 5, 12, 13, 14

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ............................................................................................ 12

*Krakauer v. Dish Network, L.L.C.*,
    No. 1:14-cv-00333, 2015 WL 5227693 (M.D.N.C. Sept. 8, 2015).................................. 3, 4

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ......................................................................................................... 12

*Makaron v. Enagic USA, Inc.*,
    324 F.R.D. 228 (C.D. Cal. 2018) ...................................................................................... 15

*Mattson v. Quicken Loans Inc.*,
    2019 WL 7630856 (D. Or. Nov. 7, 2019) ........................................................................... 8

*McMillion v. Rash Curtis & Associates*,
    No. 16-cv-03396-YGR, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017)............................... 15

*Provident Life & Accident Ins. Co. v. Fleischer*,
    18 F. App'x 554 (9th Cir. 2001)......................................................................................... 6

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) .......................................................................................... 15

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ............................................................................................ 11

*Shamblin v. Obama for Am.*,
    No. 8:13-cv-02428, 2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) ..................................... 3

*Southwell v. Mortgage Investors Corporation of Ohio, Inc.*,
    No. 13-cv-01289-MJP, 2014 WL 4057166 (W.D. Wash. Aug. 14, 2014).......................... 8

*Wakefield v. Visalus, Inc.*,
    No. 3:15-cv-1857-SI, 2019 WL 3945243 (D. Or.  2019) ............................................. 8, 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................................7, 15

*West v. California Services Bureau, Inc.*,
    323 F.R.D. 295 (N.D. Cal. 2017) ...................................................................................... 15

**STATUTES**

47 C.F.R. § 64.1200(c)(2) ........................................................................................................................ 12

47 U.S.C. § 227(c)(5) ................................................................................................................................ 12

Cal. Bus. & Prof. Code § 10010.5(b)(2) ................................................................................................. 8

Cal. Bus. & Prof. Code § 10032(a) ......................................................................................................... 8

Fed. R. Evid. 803(6) .................................................................................................................................... 5

**OTHER AUTHORITIES**

Restatement (Third) Of Agency § 1.01(c) (2006) ............................................................................... 9

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,
    70 Fed. Reg. 19,330, 19,331 (Apr. 13, 2005) .................................................................................. 8

## I.        Introduction

To streamline the issues before the Court, Plaintiff Ronald Chinitz now seeks to certify only two narrowly tailored classes, whose claims stand on a common foundation of key evidence. Specifically, Mr. Chinitz seeks to certify, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3), a narrowed class of unwanted call recipients whose telephone numbers were on the National Do Not Call Registry ("NDNCR"), as defined in Appendix A ("DNC Class"), seeking damages and injunctive relief, and, pursuant to Rule 23(b)(2), the Internal Do Not Call Class ("Internal DNC Class") set forth in the opening brief, seeking injunctive relief only. The record before the Court shows each class has tens of thousands of members; Mr. Chinitz is a typical and adequate representative of both. Common issues predominate for the DNC Class, and class treatment is the superior method to adjudicate its claims. The Internal DNC Class is sufficiently cohesive to warrant injunctive and declaratory relief.

In its opposition brief, Defendant Intero Real Estate Services ("Intero") fails to rebut Mr. Chinitz's evidence showing each Rule 23 element is met. Intero miscasts the question of predominance as one of administrative feasibility, discounting the common evidence that Mr. Chinitz has proffered that will drive the case forward by resolving major issues of fact and law at once (including his expert report and the evidence of agency and Intero's knowledge) and, instead, chooses to focus on speculative individual issues that, if they even arise, may easily be resolved in claims administration. Intero responds to the expert report of Anya Verkhovskaya ("Verkhovskaya") as if the purpose of the report is to generate a final list of class members without a claims process. Ms. Verkhovskaya's report, however, is an evidence-based methodology for proving TCPA violations on a classwide basis by an expert whose similar analyses have been accepted by courts around the country, affirmed by the Fourth Circuit, and credited by two different juries.

Intero attacks Verkhovskaya through two purported experts, John Taylor and Ken Sponsler, whose declarations provide little insight into any of the issues before the Court, and who admitted that their only assignment was to suggest there *might be* inaccuracies in Verkhovskaya's data analysis, not to prove there *were* any. Their reports are pages of speculation that Verkhovskaya's method for tallying violations might have counted calls to people for whom there would be a dispute as to whether they could, on an individual basis, prove a TCPA violation. As with any expert report, there is a small

1    margin of uncertainty to her analysis, but numerous courts have concluded the level of uncertainty
2    here is appropriate for experts in her field, and the reliability of the analysis in light of that uncertainty
3    goes to the weight of her testimony, not its admissibility.

4            Intero's other chief argument—that it cannot be liable for the calls made by its agents—is a
5    merits inquiry that should be decided on a classwide basis. Here, California statutes deem California
6    real estate brokers (such as Intero) and their real estate agents (such as the corporate agents at issue
7    here) to be in an agency relationship for purposes of torts by the agents that injure third parties in the
8    course of the agents' real estate business. And there is common evidence that the agents' unlawful
9    calling practices were not only widespread, but done with the knowledge and authorization of Intero.

10   **II.     Argument**

11           **A.     The Narrowed Classes Eliminate Any Arguable Overbreadth.**

12           By way of this Reply, Mr. Chinitz asks this Court to certify two classes with a narrowed scope,
13   thereby eliminating any arguable overbreadth. *See Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No.
14   15-cv-06314-YGR, 2017 WL 1806583, at *7 (N.D. Cal. May 5, 2017) ("*Abante I*") (adopting narrowed
15   TCPA class definition to address arguments advanced by defendants). First, Mr. Chinitz no longer
16   seeks to certify the Early/Late Call Class or the Prerecorded Message Class. With respect to the
17   Internal DNC Class, Mr. Chinitz now seeks to certify only a Rule 23(b)(2) class. Finally, Mr. Chinitz
18   proposes to narrow the DNC Class from "[a]ll persons" receiving calls from California-based Intero
19   agents to only those persons who were called by a California-based Intero agent using one of 35
20   accounts with the dialing platform provided by Mojo Dialing Solutions, LLC ("Mojo"), as defined in
21   full in Appendix A. The narrowed DNC Class rests on the analysis Verkhovskaya provides in her
22   report. Specifically, prior to drafting the report, Mojo produced dozens of files of call records, one for
23   each Mojo account associated with an email address for a California based Intero agent. Supp. Soneji
24   Decl. ¶¶ 10-15. Counsel determined that 35 of these accounts were used by Intero corporate agents,
25   as opposed to franchise agents, and that in some instances, multiple agents used one account, typically
26   creating different logins. *Id.* ¶ 25. When Verkhovskaya concluded that Intero placed 349,067 calls to
27   68,918 telephone numbers in violation of the DNC rules, (*See* Expert Report of Anya Verkhovskaya,
28   ECF No. 72 ¶ 107), only those calls associated with the 35 corporate agent Mojo accounts were

1  considered. The Mojo records, in turn, include not just numbers and dates called, but for nearly every

2  class member, the names and addresses associated with those numbers at the times they were called.

3  *Id.* ¶¶ 37-41, 83.

4      By tying the class definitions to the call records generated by Mojo, the DNC Class is even

5  more objectively verifiable than what was originally proposed. When using autodialers like Mojo,

6  Intero's California agents loaded into the dialing platform lists purchased from "lead generation"

7  companies, i.e., curated lists of California residential addresses and associated names and numbers,

8  organized by geographic area, that were for sale by residential owner, had a recently expired residential

9  listing, or had other indicators to suggest the resident might be in the market for a real estate agent.

10 Supp. Soneji Decl., Ex. V at 40:15-24; 41:25-42-13; Ex. Z at 94:3-95:3; 98:17-100:6; Ex. BB, Ex. OO;

11 *see also* Mot. at 4-5, ECF No. 70. Intero's own expert witness, who testified to extensive experience in

12 the lead generation industry, described the lists as "good lead sources for agents," because: (1) the lists

13 are not randomly generated, but rather are generated from people who want to sell their homes and

14 (2) agents demand well-curated lists of people for the geographic area in which they work so they can

15 most effectively reach their target clients. *Id.*, Ex. V at 40:15-24; 41:25-42-13.

16      **B.      Intero Offers No Legitimate Objection To Verkhovskaya's Report.**

17          **1.      Courts around the country have accepted Verkhovskaya's testimony in
                      the face of attacks like those Intero raises here.**

18      Intero argues Verkhovskaya's testimony is unreliable under Federal Rule of Evidence 702 and

19 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Opp. at 4. Yet, many courts have

20 found the same methodology to be reliable and appropriate for consideration by juries in TCPA cases.

21 *See, e.g.*, *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-cv-06314-YGR, 2018 WL 3707283, at

22 *7-8 (N.D. Cal. Aug. 3, 2018) ("*Abante II*") (denying motion to exclude Verkhovskaya's testimony

23 based on arguments similar to Intero's); *see also Johnson v. Comodo Grp., Inc.*, No. 16-cv-04469-SDW-

24 LDW, 2020 WL 525898, at *9-10 (D.N.J. Jan. 31, 2020) (collecting cases accepting Verkhovskaya's

25 testimony); *Krakauer v. Dish Network, L.L.C.*, No. 1:14-cv-00333, 2015 WL 5227693, at *6 (M.D.N.C.

26 Sept. 8, 2015) ("*Krakauer I*") (same); *Shamblin v. Obama for Am.*, No. 8:13-cv-02428, 2015 WL 1909765,

27 at *3 (M.D. Fla. Apr. 27, 2015) (finding Verkhovskaya "employ[ed] generally reliable methodologies").

28

Intero takes issue with Verkhovskaya's use of two vendors, LexisNexis and Contact Center Compliance ("CCC"). LexisNexis offered a service to assist in the identification of whether a number is business or residential; Intero speculates that it is an imperfect source. Opp. at 17. Courts in this District and around the country have rejected this identical argument as one that goes to the weight of her testimony, not its admissibility. *See, e.g., Abante I*, 2017 WL 1806583, at *4 ("[D]efendants' objection to Ms. Verkhovskaya's use of Lexis Nexis data to remove business numbers from her output list relates to the weight of her opinion, not exclusion."); *Shamblin*, 2015 WL 1909765, at *3 (crediting Verkhovskaya's experience with LexisNexis); *Krakauer I*, 2015 WL 5227693, at *11 (accepting Verkhovskaya's use of LexisNexis notwithstanding evidence that some businesses might be included); *see* ECF No. 72 ¶¶ 21-29, 66. The court in *Abante I* admitted the testimony because "it was the type of data reasonably relied upon by experts in the field and the 14% error rate was not 'unreasonably high for these particular circumstances.'" *Abante I*, 2017 WL 1806583, at *4.

Intero then takes issue with Verkhovskaya's decision not to supply LexisNexis with date ranges when conducting the query to confirm whether a number was a business number, and asserts that because of this "mistake," her report is unreliable. Intero misrepresents the data and report. Verkhovskaya understood that the calls in this case were made to consumers and not to businesses, ECF No. 72 ¶ 64, because Intero agents paid for lead lists specifically designed to connect them with people interested in buying or selling homes. To verify that understanding, Verkhovskaya submitted data to LexisNexis to assist in the identification of business numbers. The initial run of the data found six confirmed residential, no confirmed businesses, and the remainder purportedly indeterminable. *Id.* ¶ 68, Taylor Report ¶ 18, ECF No. 101-9. She opined that the remainder were residential based on the information provided by counsel and her years of experience analyzing sources of phone numbers in testing Lexis data . Supp. Soneji Decl., Ex. AA at 122:7-125:5; 139:6-141:16.

Nevertheless, Intero asserts her conclusion about the number of residential numbers is unreliable, citing a declaration from LexisNexis, in which an employee states that the work order run in this case required her to input a date range in order to accurately identify the number of businesses. While the residential nature of the data set and her conclusions about it in her report should be credited, Verkhovskaya ran the NDNCR data set through LexisNexis a second time, inputting a data

1   range in accordance with Intero's criticism. Verkhovskaya Decl. ¶¶ 5-6. That second run confirms her

2   initial report. Even when run with a date range, less than 0.7% percent of the numbers called by the

3   corporate agents using Mojo were identified as businesses, *id.* ¶ 8, well within the 14% margin of error

4   that the *Abante* and *Krakauer* courts found to be acceptable. While it is true that LexisNexis cannot

5   confirm that every record in the class is a business or a residential number, consistent with *Abante I*

6   and *Krakauer I*, the jury is entitled to consider Verkhovskaya's experience working with LexisNexis as

7   well as testimony on the residential nature of the data set.

8       Intero also introduces a declaration from CCC, a company whose services Verkhovskaya

9   utilized to identify the agent calls placed to numbers on the NDNCR at the time of the call. ECF No.

10  72 ¶¶ 49-55, 58. The CCC representative states that, CCC data shows when a number was most

11  recently added to the NDNCR but does not say "with certainty the date on which a phone number

12  [was] first" listed on the NDNCR. Decl. Allen, ECF No. 101-7 ¶ 6. He also states that CCC "does

13  not warrant" that its data "can reliably be used in the manner employed by Ms. Verkhovskaya." *Id.* ¶

14  4. This declaration does not undermine her opinion. Verkhovskaya chose CCC to provide her

15  historical NDNCR data because, by only providing the most recent date a number was added to the

16  NDNCR, it results in more conservative data analysis. ECF No. 72 ¶ 58. As with the LexisNexis data,

17  other courts have approved of her reliance on NDNCR data provided by third-party firms. *See, e.g.,*

18  *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 392 (M.D.N.C. 2015) ("*Krakauer II*") (approving

19  Verkhovskaya's use of third-party DNC scrub service).

20      Finally, Intero offers a declaration from a representative of Mojo and suggests without

21  substantiation that Mojo claims its data is unreliable. But like CCC, Mojo's call records are business

22  records, and carry the imprimatur of reliability. Fed. R. Evid. 803(6).

23          **2.      No weight should be afforded to Taylor's and Sponsler's declarations.**

24      Many of the criticisms that Taylor and Sponsler raise are improper. In advance of trial, Mr.

25  Chinitz will seek to exclude their testimony under *Daubert*. But for purposes of this motion, they

26  provide no competent testimony with respect to the issues before the Court and should be

27  disregarded. Taylor's report is purportedly based on his experience "analyzing data related to call

28  records and fax records in cases which include claims arising under the [TCPA]."  ECF No. 101-9 ¶

3. But many of his opinions go far beyond the scope of this expertise in data analysis and amount to speculation on other subject matters. *See, e.g., id.* ¶ 27 (opining on rate of phone number reassignments, quoting 2011 Wall Street Journal article); ¶ 13 (opining on what error rates are acceptable in TCPA cases); ¶¶ 31, 33, 34, 52.d (opining on requirements of the TCPA and FCC regulations). The opinions in the above-referenced paragraphs should be excluded. *See Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (upholding exclusion of expert opinion that ventured "outside the areas of [the Expert's] expertise"); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law."). Taylor's opinions as to the accuracy rate of Verkhovskaya's sources, offered without any foundation or investigation, should also be excluded. *See, e.g.,* ECF No. 101-9 ¶¶ 47, 52.c; *see Provident Life & Accident Ins. Co. v. Fleischer*, 18 F. App'x 554, 556 (9th Cir. 2001) (unpublished) (upholding exclusion where expert offered "no foundation . . . [or] studies or principles [to] support [its] conclusion").

Sponsler's report should be disregarded as it does not inform any Rule 23 issue. *See Dobrosky v. Arthur J. Gallagher Serv. Co.*, LLC, No. EDCV130646JGBSPX, 2014 WL 10988092, at *3 (C.D. Cal. July 30, 2014) (expert report disregarded where it provided no insight on any Rule 23 element). He opines solely on whether Ms. Verkhovskaya, an experienced claims administrator, ECF No. 72, ¶¶ 14-35, can "reliably and accurately identify names and addresses of current class members." Sponsler Report ¶ 4, Dkt. 101-10. There is no such requirement in this Circuit. In any event, his conclusions are based on the assumption that the Mojo records, which identify names and addresses of class members, are unreliable business records, when he did not undertake a review of the records or identify any error. Supp. Soneji Decl., Ex. V at 36:9-37:2; 103:1-107:5.

3.   **The Court has already rejected Intero's Rule 37 argument.**

Intero argues the Court should exclude Verkhovskaya's report pursuant to Rule 37 because she purportedly did not produce intermediate data analysis files. But she produced everything, as discussed in Mr. Chinitz's opposition to Intero's first Rule 37 motion on this issue. ECF No. 83. The Court denied Intero's request to strike her report then based on this exact argument; it should do so again. Order, ECF No. 87; *compare* Opp. at 3, *with* Reply Mot. Strike at 4:6-25, ECF No. 86.

1

**C.**     **Mr. Chinitz Has Submitted Evidence Establishing All Rule 23(a) Factors.**

2

**1.**     **Numerosity is met.**

3      Intero does not dispute that tens of thousands of calls were placed by its California real estate

4  agents to DNC Class members but, instead, takes issue with the fact that Verkhovskaya's query

5  through LexisNexis identified six confirmed residential numbers and many more were unconfirmed.

6  Intero's focus on the six confirmed records ignores the well-settled principle that "[i]n determining

7  whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts

8  before it." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013); *see also Bakov v. Consolidated World*

9  *Travel, Inc.*, No. 15-cv-02980, 2019 WL 1294659, at *15 (N.D. Ill. 2019) (finding numerosity in TCPA

10  case; explaining that exact number of class members need not be shown "as long as a conclusion is

11  apparent from good-faith estimates"). Here, even when run in accordance with the LexisNexis work

12  order at the center of Intero's attacks, 25,802 numbers are confirmed as residential by LexisNexis.

13  Verkhovskaya Decl. ¶ 8. For the Internal DNC Class, under Rule 23(b)(2), the numerosity requirement

14  is relaxed. *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016). As

15  discussed above, given that tens of thousands of people were called twice in a twelve-month period,

16  ECF No. 72 ¶¶ 107-09, and that Intero did not maintain any form of internal do not call list until

17  2018, Supp. Soneji Decl., Ex. Y at 88:21-89:16, it is reasonable to infer that at least some of those

18  people received calls after requesting not to be called again.

19

**2.**     **Commonality is met.**

20      In his opening brief, Mr. Chinitz identifies six questions with common answers that will drive

21  resolution of this case. Mot. 14-15; *see Booth v. Appstack*, No. 13-cv-1533-JLR, 2016 WL 3030256, *8

22  (W.D. Wash. May 24, 2016) (finding commonality in TCPA case satisfied where claims were based on

23  same common course of conduct involving an autodialer). Four of these (numbers 1, 2, 5, and 6)

24  remain operative after the narrowing of the classes set forth herein. Intero challenges only one, thereby

25  conceding commonality is satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (even a

26  single common question will satisfy commonality requirement). And Intero's one remaining attack on

27  commonality—whether it should be liable for the torts committed by its agents—has little bearing on

28  the common question for the Internal DNC Class; Intero either was responsible for maintaining an

1    internal do not call list in accordance with 47 C.F.R. 64.1200(d) or it was not.

2                    **3.      Typicality and adequacy are met.**

3           Intero attempts to undermine Mr. Chinitz's typicality and adequacy showing by arguing he is

4    subject to a unique defense because his telephone numbers are not residential, as "he is a 'landlord.'"

5    Opp. at 13-14. Intero is wrong on the law and the facts. Mr. Chinitz does not run a "business"; rather,

6    he annually rents a single guest house sharing a lot with his home. Supp. Soneji Decl., Ex. W  at 20:6-

7    10; 26:4-27:1; *see also id.* at 17:25-18:10, 19:10-22, 33:6-15, 35:3-10, 46:13-16, 51:21-24, 52:14-24, 54:14-

8    17 (Mr. Chinitz does not treat his rental as a "business"). Furthermore, he testified that while it was

9    "possible" a tenant could have contacted him by phone over the last five years, he could not recall

10   even a single such incident, as he communicates with tenants "in person." *Id.* at 35:3-24. There is no

11   unique defense here; courts and the FCC have afforded TCPA protection to residential telephone

12   lines even if they are occasionally used in a home-based business. *See Southwell v. Mortgage Investors*

13   *Corporation of Ohio, Inc.*, No. 13-cv-01289-MJP, 2014 WL 4057166, at *3 (W.D. Wash. Aug. 14, 2014)

14   (occasional use by farmer of residential cell number for sale of sheep did not exempt phone from

15   TCPA protection); Rules and Regulations Implementing the Telephone Consumer Protection Act of

16   1991, 70 Fed. Reg. 19,330, 19,331 (Apr. 13, 2005). Courts have held typicality was met in cases such

17   as this one. *See, e.g., Wakefield v. Visalus, Inc.*, No. 3:15-cv-1857-SI, 2019 WL 3945243, at *9-10 (D. Or.

18   2019). Intero's reliance on *Mattson v. Quicken Loans Inc.*, 2019 WL 7630856 (D. Or. Nov. 7, 2019), is

19   misplaced because there, the phone and its service were paid for by the plaintiff's employer, *id.* at *5.

20          **D.      The Court Should Certify the DNC Class under Rule 23(b)(3).**

21          Intero does not contest Chinitz's showing of superiority under Rule 23(b)(3). While Intero

22   challenges predominance, for the reasons set forth below, its arguments fail.

23                   **1.      Intero's agency arguments reveal common, predominant issues.**

24          Intero's argument that its agents are "independent contractors" will succeed or fail based on

25   common evidence, which supports predominance. In California, real estate brokers, such as Intero,

26   are vicariously liable to third parties injured by the tortious conduct of its licensed real estate agents.

27   *See* Cal. Bus. & Prof. Code § 10010.5(b)(2); Cal. Bus. & Prof. Code § 10032(a); *see also In re King St.*

28   *Investments, Inc.*, 219 B.R. 848, 856 n.12 (B.A.P. 9th Cir. 1998); *California Real Estate Loans, Inc. v. Wallace,*

1    23 Cal. Rptr. 2d 462, 466 n.2 (Ct. App. 1993). Thus, the common, predominant question here is simple:

2    Given that law, is Intero, as a California real estate broker, vicariously liable to parties injured by its

3    TCPA violations? Intero asserts that this is not a common, predominant question because it claims

4    that agency questions under the TCPA must be "examined under" federal common law. Opp. at 10.

5    But resolution of that question is a merits inquiry that the Court can undertake to resolve the claims

6    of the entire class.

7            Moreover, Intero is wrong on the law. While the Ninth Circuit has held that when analyzing

8    principles of agency under the TCPA, courts should look to federal common law, as set forth in the

9    Restatement (Third) of Agency, *Henderson v. United Student Aid Funds, Inc.,* 918 F.3d 1068, 1072 (9th

10   Cir. 2019), it has not considered whether the federal common law of agency incorporates state statutes

11   establishing agency. Indeed, Intero has not argued that the TCPA preempts state law. And, the

12   Restatement itself contemplates that state statutes determine the contours of agency, expressly

13   acknowledging that statutes may impose "the consequences of agency," regardless of the parties'

14   consent thereto. Restatement (Third) Of Agency § 1.01(d) (2006) (noting that the "legal consequences

15   of agency" arise "when an 'agent's' powers are specified by operation of law"). Moreover, the concept

16   that federal common law should look to state statutes is not controversial; rather, the United States

17   Supreme Court has explained that there is a "presumption that state law should be incorporated into

18   federal common law." *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 98 (1991). That presumption is

19   "particularly strong in areas in which private parties have entered legal relationships with the

20   expectation that their rights and obligations would be governed by state-law standards," *id.,* as is the

21   case here, where Intero affiliated itself with state-licensed real estate agents. And while Intero relies

22   on *Chinitz v. NRT West, Inc.,* No. 18-cv-06100-NC, 2019 WL 4142044 (N.D. Cal. Aug. 30, 2019), its

23   reliance is misplaced. There, the court did not make any findings as to the interplay between the TCPA

24   and California statutes; its denial of certification was based on the nationwide nature of the class. *Id.*

25   at *5. And it implied it would certify a California only class if that had been asked. *Id.* Here, the class

26   is limited to people called by Intero corporate agents in California.

27           Intero's argument that the existence of franchise agents creates individual questions does not

28   carry any weight. Intero offers only the declaration of Heather Wang, who fails to identify any agent

1   with a Mojo account who associated their license with any company other than Intero and submits no

2   support for her ambiguous statements suggesting any of these agents did not in fact work for Intero.

3   Decl. Wang ¶ 4, ECF No. 101-5. Moreover, common evidence belies her testimony. With the

4   exception of two accounts that used false monikers to obscure the agents' names, every Mojo call

5   record file at issue here is associated with Intero corporate agents, in Intero's own interrogatory

6   responses and websites, as well as licensing records from the California Department of Real Estate.

7   Supp. Soneji Decl. ¶¶ 20-24, Exs. DD, FF, EE, GG, HH.

8          Intero also argues Mr. Chinitz cannot establish that it ratified the illegal calling practices of its

9   agents on a classwide basis because there is "no evidence" showing Intero had knowledge of the

10  calling practices of its associates or that it benefited from any improper calls. Opp. at 11. This

11  argument ignores the extensive evidence in the opening brief. *See* Mot. at 2-9.  It also does not show

12  individual questions predominate, because Intero does not identify actual differences across its agents

13  to suggest that it ratified the actions of some but not others. Indeed, if Mr. Chinitz's evidence of

14  ratification were found insufficient, all class members' claims would fail at once.

15         But the common evidence of Intero's knowledge of its agents' cold-calling practices, and

16  indeed its direction to agents to engage in such practices—supporting not only ratification but also

17  actual authority—is abundant. Intero provides training, on a monthly and on-demand basis, that

18  specifically directs its agents to aggressively cold-call leads, to use Mojo, and to ignore the NDNCR.

19  *See* Mot. at 3-4. These trainings are hosted and promoted by Intero—both on its Intero Live platform

20  and through Intero managers' strong commendations of lead generation trainings led by Mr. Nicoli.

21  *See* Mot. at 3. Former training manager Jason Traina, moreover, actively provided auto-dialer

22  recommendations in Intero's lead generation trainings concerning auto-dialer recommendations. *See,*

23  *e.g*, Mot., Video Ex. 12 at 00:08-00:11; Mot., Video Ex. 15 at 1:57-2:08.

24         Furthermore, after this Court ordered Intero's agents to produce their documents, *see* ECF

25  No. 69, more common evidence came to light. For example, Intero leadership encouraged a culture

26  of non-compliance, which Intero's CEO John Thompson summarized in response to a do-not-call

27  request, "If you aren't upsetting someone out there you aren't probably doing enough!" Supp. Soneji

28  Decl., Ex. II. Managers did not take the do not call list or related complaints seriously. *Id.,* Ex. JJ. The

1    agent emails also indicate that Mr. Nicoli—Intero's principal lead generation trainer—was considered

2    a branch manager or marketing coordinator. *E.g.*, *id.*, Ex. KK; *see also id.* Ex. LL. This common

3    evidence reveals that Intero consented to, ratified, and even encouraged the unlawful calling practices

4    of its agents. *Henderson*, 918 F.3d at 1073-75 ("The focal point of ratification is an observable indication

5    that a principal has exercised an explicit or implicit choice to consent to the purported agent's acts.").

6                    2.    **Verkhovskaya's report proves TCPA violations on a classwide basis.**

7                    Intero's remaining attacks on predominance, and by extension, Verkhovskaya's expert report,

8    conflate the question of how to prove there was a violation of the TCPA with the question of how to

9    identify the names of class members who will receive compensation for those violations. Mr. Chinitz

10   has shown the former, and Rule 23 does not require the latter.

11                   a.    **At this stage, Mr. Chinitz need not identify all class members.**

12                   In *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), the Ninth Circuit rejected the

13   idea that a plaintiff must propose an administratively feasible way to identify all class members at the

14   class certification stage. *Id.* at 1133. Instead, it noted that courts have a variety of tools to manage this

15   process at a later date, relying on "claim administrators, various auditing processes, sampling for fraud

16   detection, follow-up notices to explain the claims process, and other techniques tailored by the parties

17   and the court." *Id.* at 1130. And where damages are decided in the aggregate via a method of common

18   proof, a defendant's liability will not turn on the potential for fraudulent claims. *Id.* at 1132. In its

19   ruling, the court relied on a decision arising under the TCPA from the Eighth Circuit, *Sandusky Wellness*

20   *Ctr., LLC v. Medtox Sci., Inc.,* 821 F.3d 992, 993 (8th Cir. 2016). *Sandusky Wellness*, in turn, held that the

21   names of the people entitled to receive the statutory damages were irrelevant to class certification, and

22   that the class was certifiable because "fax logs showing the numbers that received each fax are

23   objective criteria." *Id.* at 997.

24                   Consistent with that precedent, the DNC Class is defined to include all people who received

25   a call placed using the Mojo platform in violation of the TCPA's NDNCR rules. *Compare id.* at 994

26   *with* App'x A. The Mojo call records are objective criteria that can be used to inform the distribution

27   of damages, whereas the purpose of Verkhovskaya's report at this stage is not to identify those people

28   entitled to recover, but to provide a methodology by which a jury can determine in the aggregate

1    whether Intero placed thousands of calls in violation of the TCPA. *See Booth*, 2016 WL 3030256, at

2    *10 (relying on expert report identifying and aggregating numbers that received calls in violation of

3    TCPA to find predominance); *Krakauer II*, 311 F.R.D. at 396 (accepting Verkhovskaya's methodology

4    of aggregating TCPA violations); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir.

5    2019) ("*Krakauer III*") (affirming certification of NDNCR class, since "all of the major issues in the

6    case could be shown through aggregate records"). Here, Verkhovskaya utilized the same methodology

7    at issue in *Krakauer II*, which was both credited by a jury and affirmed by the Fourth Circuit in *Krakauer*

8    *III*, to identify and compile violations to facilitate resolution of the claims in one fell swoop.

9         Intero argues that because the TCPA prohibits an entity from "initiat[ing] any telephone

10   solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number

11   on the national do-not-call registry," 47 C.F.R. § 64.1200(c)(2), *only* the subscriber who registered the

12   number has standing to sue. Opp. at 17. In other words, in Intero's view, if the cellular family plan is

13   in Jane's name, and her husband places the family's numbers on the registry, but her son receives the

14   prohibited call, there is no TCPA violation, because Jane, the subscriber, did not place the number on

15   the registry or receive the call. Thus, Intero contends that for this Court to accept Verkhovskaya's

16   report and certify the DNC Class, Mr. Chinitz must have a way to show that Jane has been excluded

17   from the class. Intero misunderstands the statute. While section 64.1200(c)(2) identifies the violation,

18   47 U.S.C. § 227(c)(5) provides the right to sue for that violation to a "person," a broader group than

19   simply a subscriber who placed the number on the registry. It is this distinction that the Fourth Circuit

20   found critical in *Krakauer III*, explaining that the question of who can maintain a TCPA claim turns

21   on "whether the party is within the statute's 'zone of interests.'" *Krakauer III*, 925 F.3d at 656 (quoting

22   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014)). The Fourth Circuit

23   explained that the TCPA was "intended to protect 'consumers,' not simply 'subscribers,'" and that

24   accordingly, it had "no doubt" that anyone "who 'received' calls that were placed 'in violation of' the

25   TCPA regulations" had standing to sue and recover. *Id.* Reading *Krakauer III* with *Briseno* and *Sandusky*

26   *Wellness*, a TCPA plaintiff is not required to supply at class certification a list of names of people whose

27   characteristics align perfectly with section 64.1200(c)(2). Rather, a plaintiff need only provide a

28   methodology that shows whether a defendant systematically placed calls in violation of section

64.1200(c)(2). As set forth below, Mr. Chinitz has done so.

### b. Mr. Chinitz can prove Intero dialed residential numbers on a classwide basis.

For the DNC Class, Intero argues that individual inquiries are needed to determine whether a number is business or residential, but it is mistaken. This argument ignores the evidence-based conclusions drawn from the fact that those targeted to be called were individuals likely looking to buy or sell homes, Verkhovskaya's experience with the LexisNexis data, and the many cases that have rejected this argument, discussed in section II.B.1, *supra*. More importantly, the mere fact that some numbers in Ms. Verkovskaya's report may be business numbers does not transform a common question into an individual one for at least two reasons.

First, Intero asserts that individual issues predominate as to whether a number is a business line, but it fails to identify a single business line in the class, even though it possesses call records that identify the name and number of the contact called. Supp. Soneji Decl. ¶¶ 10-12. Instead, Intero speculates that some of those numbers might be businesses, citing only to a declaration from one agent who "estimate[s] that approximately five percent" of the numbers he called are businesses. ECF No. 101-2, Declaration of Hoi Wing Ng at ¶ 3. Even if the Court were to credit this vague testimony, five percent of the calls by one agent falls far below the 14% rate that courts have found acceptable. *See Abante Rooster*, 2017 WL 1806583, at *4; *see also* § II.B.1, *supra*.

Second, the district court in *Krakauer II* rejected the idea that a *de minimis* showing of business numbers can defeat predominance, explaining that "[t]he fact that a class list contains members whose claims may fail on the merits does not mean that the class cannot be certified." *Krakauer II*, 311 F.R.D. at 396 (finding evidence of "a few dozen numbers" and a claim by counsel that there may be "hundreds" more to be insufficient to undercut predominance). Mr. Chinitz expects that Intero will contest any methodology that incidentally includes some telephone numbers belonging to businesses. But this argument ignores that the class definition purposefully excludes businesses, who can be denied recovery during the claims process. *See* App'x A; *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 329 (W.D. Okla. 2018) ("[I]f issues need to be tried to determine whether a line is a business line or a residential line, those issues could be resolved by asking class members whether the

1   line in question is a residential line during the class notification process, or, … through a standardized

2   and efficient claims process at a later stage."). It also ignores discretion that this Court has to manage

3   this case through jury instructions and subclasses; indeed, during the pre-trial hearing in the *Krakauer*

4   matter, the court agreed to the parties' proposal to divide the phone numbers at issue in to "buckets"

5   based on objective criteria, so the jury could hear the expert's methodology as to each bucket and

6   make a decision as to whether and how to discount it. Supp. Soneji Decl. ¶ 31 & Exs. MM, NN. *Cf.*

7   *Krakauer II*, 311 F.R.D. at 397 ("Even if resolution of these issues requires some individualized inquiry,

8   these issues are not complex and are entirely manageable.").

9       Finally, Intero speculates that some individuals with residential lines might use those lines for

10  incidental business purposes, necessitating individual inquiries. But Intero identifies nobody in the

11  class fitting this description; its characterization of Mr. Chinitz is unsupported by the facts; and courts

12  have consistently rejected this argument. *See* § II.B.1, *supra*; *Wakefield v. Visalus, Inc.*, No. 3:15-cv-1857-

13  SI, 2019 WL 3945243, at *7 (D. Or. Aug. 21, 2019). Moreover, this argument again ignores the broad

14  private right of action in the TCPA and the goals of protecting consumers. *See* § II.D.2.a, *supra*.

15          **3.    Intero's speculation as to individual issues affecting the DNC Class
             does not defeat predominance.**

16      Intero speculates that there are individual issues with respect to whether a particular number

17  was on the NDNCR each time its agents called and whether the person who added the number to the

18  NDNCR was the same person who received the calls. Opp. at 18-20. But Intero overlooks the Fourth

19  Circuit's holding in *Krakauer III* that a person's entitlement to recovery under the TCPA does not hew

20  to the question of whether that person is the subscriber who registered the number. *See* § II.D.2.a,

21  *supra*. Moreover, Intero's assertions that these hypothetical people might be improperly included in

22  the DNC Class are just that—hypothetical. Indeed, Intero's expert asserted that the most accurate

23  DNC scrubs could only be performed by his company (while also admitting CCC, which he criticized,

24  was his competitor), but he testified that he was unlikely to permit Verkhovskaya to utilize his

25  company's services. Supp. Decl. Soneji, Ex. X at 127:19-129:23. Despite access to what he alleges is

26  more reliable NDNCR data, Intero's expert (1) failed to identify even one person whom it contended

27  was improperly swept into the class as a result of the work done by Verkhovskaya through CCC and

28

1   (2) would refuse to allow Verkhovskaya access to that system. Intero's failure to support its assertions

2   with concrete evidence should be rejected. *Cf. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S.

3   455, 469 (2013) (while a "clever mind could conjure up fantastic scenarios," questions that

4   "hypothetically might arise" did not defeat predominance). And to the extent there might be a couple

5   numbers in the DNC Class which were not on the NDNCR, that is best resolved in the claims process

6   and does not overshadow the predominant, common issues discussed herein. *See* § II.D.2.a, *supra*.

7           **E.      The Court Should Certify the Classes under Rule 23(b)(2).**

8           Intero claims at Rule 23(b)(2) classes cannot be certified because Mr. Chinitz seeks statutory

9   damages as a "primary" form of relief. Opp. at 25. But on behalf of the DNC Class, Mr. Chinitz seeks

10  a Rule 23(b)(2) class for an injunction in addition to (or if denied, in the alternative to) a Rule 23(b)(3)

11  class for damages and an injunction. Numerous courts have recognized the propriety of certification

12  of a 23(b)(2) injunctive relief class alongside a 23(b)(3) damages class in the same action. *See, e.g.*,

13  *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 233-34 (C.D. Cal. 2018) (certifying both injunctive relief

14  and damages classes in TCPA case); *West v. California Services Bureau, Inc.*, 323 F.R.D. 295, 307 (N.D.

15  Cal. 2017) (same); *McMillion v. Rash Curtis & Associates*, No. 16-cv-03396-YGR, 2017 WL 3895764, at

16  *10 (N.D. Cal. Sept. 6, 2017) (same). Intero's lone argument has no weight as to the Internal DNC

17  Class, which only seeks injunctive relief addressing whether Intero violated 47 C.F.R. § 64.1200(d) and

18  (e) when it failed to institute procedures for maintaining an internal do not call list. Such an issue is of

19  the sort that "can be enjoined or declared unlawful only as to all of the class members or as to none

20  of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360; *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir.

21  2010) (holding that Rule 23(b)(2) "does not require us to examine the viability …of class members'

22  claims for …injunctive relief, but only to look at whether class members seek uniform relief from a

23  practice applicable to all of them").

24  **III.     Conclusion**

25          For the reasons given herein and in Mr. Chinitz's opening papers, this Court should certify

26  the DNC Class under Rule 23(a), (b)(2), and (b)(3), or in the alternative, under Rule 23(a) and (b)(2);

27  certify the Internal DNC Class under Rule 23(a) and (b)(2); appoint Mr. Chinitz as the representative

28  of both classes; and appoint Tycko & Zavareei LLP and Reese LLP as class counsel.

1

2   Date: May 29, 2020

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TYCKO & ZAVAREEI LLP**

By: */s/ Sabita J. Soneji*

Sabita J. Soneji (State Bar No. 224262)
ssoneji@tzlegal.com
V Chai Oliver Prentice (State Bar No. 309807)
vprentice@tzlegal.com
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

Hassan A. Zavareei (State Bar No. 181547)
hzavareei@tzlegal.com
Kristen G. Simplicio (State Bar No. 263291)
ksimplicio@tzlegal.com
Mark A. Clifford (*pro hac vice*)
mclifford@tzlegal.com
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900

George V. Granade (State Bar No. 316050)
ggranade@reesellp.com
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

Michael R. Reese (State Bar No. 206773)
mreese@reesellp.com
Carlos F. Ramirez (*pro hac vice*)
cramirez@reesellp.com
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiff Ronald Chinitz
and the Proposed Class*